BASH, by Guardian *ad litem,* and others, Plaintiffs and Respondents, v. EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, Defendants and Respondents: READY and another, Impleaded Defendants and Appellants.

*February 27—April 9, 1968.*

442

For the defendants-appellants Employers Mutual Liability Insurance Company of Wisconsin and Frank J. Szymanski there was a brief by *Whaley & Whaley* of Racine, and oral argument by *John V. Whaley*.

For the impleaded defendants-appellants Donald L. Ready and United States Fire Insurance Company there was a brief by *Heide, Sheldon, Hartley & Thom* and *W. A. Sheldon*, all of Kenosha, and oral argument by *W. A. Sheldon*.

For the plaintiffs-respondents Rebecca Bash and Janet M. Ready there was a brief by *Irving D. Gaines* and *H. L. Kastrul*, attorneys, and *David A. Saichek* of counsel, all of Milwaukee, and oral argument by *Mr. Gaines*.

For the defendant-respondent and cross-appellant Frank J. Szymanski there was a brief by *Baker, Juliani, Stanhope, Joling & Greco* and *Robert J. Joling*, all of Kenosha, and oral argument by *Robert J. Joling*.

WILKIE, J. Six issues are presented by the two appeals. They are:

1. Is the jury apportionment of causal negligence supported by credible evidence?

2. Is the jury award of $35,000 to Rebecca Bash for personal injuries excessive?

3. Is the jury award of $3,000 to Mrs. Ready for Rebecca's future medical and dental expenses excessive?

4. Did the trial court abuse its discretion in reducing the Szymanski awards?

5. Did the trial court err in refusing to send a certain exhibit to the jury room?

6. Were plaintiffs' disbursements properly divided by the trial court?

*Apportionment of Negligence.*

The apportionment of causal negligence between Szymanski and Ready was clearly a jury question.

Ordinarily the comparison of causal negligence is peculiarly a jury function [3] and only in rare cases is it permissible for a court to hold as a matter of law that the negligence of one party must constitute at least 50 percent of the total.[4]

As in *Bach v. Liberty Mut. Fire Ins. Co.*,[5] in the instant case there were no independent witnesses to the accident. Two completely contradictory but credible versions of how the accident happened were presented by Szymanski and Ready, giving rise to a jury question. Szymanski testified that as he came over a rise to the west of the intersection, he observed the Ready vehicle entering the intersection from JR in the process of turning east into E. He claimed that the two vehicles were only a few car lengths apart at this moment and that he jammed on the brakes and swerved to the left in an attempt to avoid a collision. His efforts were to no avail and the right front of his automobile struck the left rear of the Ready vehicle.

On the other hand, Ready testified that he stopped for the arterial stop sign on JR, crept out a bit, observed no cars on E, started into E and made his left turn. He claimed he was struck about 140 feet east of the intersection.

After the accident, Szymanski's car came to rest on the north side of E some "25 paces or 75 feet" from a pole located across from the intersection and the Ready vehicle stopped some "20 paces further east which would be 60 feet in back of the Szymanski car." Since it is conceded that both cars moved eastwardly after the impact and that they were facing different directions, this case

[3] *Barber v. Oshkosh* (1967), 35 Wis. 2d 751, 754, 151 N. W. 2d 739, and cases cited therein.

[4] *Baumgarten v. Jones* (1963), 21 Wis. 2d 467, 471, 124 N. W. 2d 609; *Rewolinski v. Harley-Davidson Motor Co.* (1966), 32 Wis. 2d 680, 684, 146 N. W. 2d 485.

[5] (1967), 36 Wis. 2d 72, 152 N. W. 2d 911.

is like the usual case in which the positions of the vehicles after the accident is of no probative value.[6]

In addition to the conflicting versions of Szymanski and Ready about how the accident happened and the inconclusive physical evidence concerning the movement of the cars after the impact, there was testimony from two witnesses, the investigating police officer at the scene, and Richard Hanks, both to the effect that following the accident Ready stated that he was "almost straight when he was hit" and that due to ice on the road "he just slid when he came up to the stop sign." From this testimony the jury could have inferred that the point of impact was in the intersection.

We therefore conclude that there is credible evidence to support the jury finding that both drivers were negligent and apportioning the negligence 75–25 percent to Ready and Szymanski respectively.[7]

### Award to Rebecca Bash.

The claim is made that the jury award of $35,000 for Rebecca's personal injuries is excessive.

The standard of this court's review of damage verdicts challenged as excessive is that the verdict will not be disturbed if there is any credible evidence which, under any reasonable view, supports the jury finding.[8] This is

---

[6] *New Amsterdam Casualty Co. v. Farmers Mut. Automobile Ins. Co.* (1959), 5 Wis. 2d 646, 94 N. W. 2d 175.

[7] *Williams v. Milwaukee & Suburban Transport Corp.* (1967), 37 Wis. 2d 402, 408, 155 N. W. 2d 100; *Gustin v. Johannes* (1967), 36 Wis. 2d 195, 203, 153 N. W. 2d 70; *Barber v. Oshkosh, supra,* footnote 3, at page 754.

[8] *Burke v. National Farmers Union Property & Casualty Co.* (1967), 36 Wis. 2d 427, 437, 153 N. W. 2d 545; *Metcalf v. Consolidated Badger Co-operative* (1965), 28 Wis. 2d 552, 561, 137 N. W. 2d 457; *Erdmann v. Milwaukee Automobile Mut. Ins. Co.* (1963), 20 Wis. 2d 439, 446, 122 N. W. 2d 430; *Springen v. Ager Plumbing & Heating, Inc.* (1963), 19 Wis. 2d 487, 489, 120 N. W. 2d 692.

especially true when the verdict has the approval of the trial court.[9]

Both Ready and Szymanski testified that young Rebecca, when picked up from her position on the front floor of the car where she had been thrown from the front seat by the force of the impact, was crying and bleeding from the face. Dr. Walid Burhani, a Kenosha physician, treated Rebecca in the emergency room at the hospital immediately following the accident. He observed multiple lacerations of the mouth, facial abrasions, and several evulsed teeth. X rays disclosed fractures of the jaw and right humerus. Rebecca was in pain during her hospital confinement, which lasted one week.

Dr. Lawrence Hinz, a dentist from Racine, examined Rebecca in the pediatric section of the hospital on the day after the accident. He noted that her face and lips were badly swollen and that the fractures of the mandible caused injury to several teeth. The doctor extracted seven of Rebecca's upper baby teeth and two lower teeth. The doctor testified that future dental work would be required because some of the permanent teeth had "drifted" as a result of the extractions following the accident.

Another dentist, Dr. Dorothy De Rose, examined Rebecca on July 9, 1965. During the trial Dr. De Rose testified that Rebecca would need orthodontic work in the future.

Dr. Louis Maxey, a plastic surgeon, first examined Rebecca on July 1, 1966, two and one-half years after the accident. The doctor testified that Rebecca's lower lip was larger on the right side than on the left. He also observed that Rebecca was rather lethargic and inattentive. The doctor performed a plastic surgery procedure known as a "cheiloplasty" to correct Rebecca's lip condition. Rebecca was hospitalized for three days following the operation.

[9] *Id.*

Dr. Maxey suggested to Mrs. Ready that she take her daughter to see a neurologist. Acting upon this advice, Rebecca was taken to Dr. A. Yale Gerol, a noted Racine neurologist. Mrs. Ready related Rebecca's history to Dr. Gerol. Included in that history was the fact that Rebecca "falls asleep very rapidly when not distracted."

Dr. Gerol performed a neurological examination and sent the child to Dr. Walter McDonald, a clinical psychologist, for evaluation. Dr. McDonald reported to Dr. Gerol that his diagnosis was mild mental retardation not caused by the accident.

Dr. Gerol had Rebecca sent to St. Luke's hospital in Racine where an electroencephalogram (EEG) was performed. After evaluating the results of the tests, and in the light of his neurological examination and Rebecca's history, it was Dr. Gerol's opinion that Rebecca had *petit mal* epilepsy. The doctor testified that Rebecca's condition was caused by the accident.

On direct examination, Dr. Gerol testified (in part) as follows:

"*Q.* What impression or opinion did you arrive at as far as this patient was concerned after evaluating and examining the results of the tracings of the electroencephalogram performed? *A.* This is a patient who has several kinds of epilepsy. One is a so-called *petit mal* epilepsy and one is called *grand mal* epilepsy.

"*Q.* What is *petit mal* epilepsy, or what is the difference between the two? *A. Petit mal* means little sickness in French and *grand mal* means big sickness. A *petit mal* epilepsy occurs without even realizing it occurs and happens very fast and may be confused with normal events and you are not aware they are seizures. Sometimes the child's head will drop forward and look back up in a split second. For example maybe a child is swinging and falls off the swing and comes right up again. This is *petit mal* epilepsy. The *grand mal* epilepsy is the one most people are aware of where the individual will suddenly cry and perhaps fall to the ground and saliva comes from the mouth. There are all sorts of variations in between.

"*Q.* What final diagnosis did you make? *A.* This is a little child who has *petit mal* epilepsy definitely. The question is whether she will break through with *grand mal* epilepsy and be somewhat mentally retarded. I could not determine whether the mental retardation is the result of the epilepsy or not.

"*Q.* Have you an opinion based upon reasonable medical probability as to whether or not the automobile accident of January 31st, 1964, and your history, was an efficient cause of the manifestations of the epileptic symptoms you presently found to exist in Rebecca Bash?

"Mr. Whaley: I object to the form of the question, if the court please.

"(Question withdrawn)

"*Q.* Based upon your examination of this patient and the electroencephalogram test made of her, and particularly the history that was given to you by her mother concerning the pattern of falling asleep, do you have an opinion to a reasonable medical probability as to exactly what was happening when she fell asleep? *A.* Yes, sir,

"*Q.* What is that opinion? *A.* It is my opinion this child was having seizures when she was so-called falling asleep.

"*Q.* State whether or not you received any history from the mother of any such difficulty having existed in this young girl prior to the occurrence of this automobile accident? *A.* Yes, she said the child had not had this prior to the accident.

"*Q.* Did you receive information from the mother as to how many months had elapsed from the time of the accident to these incidents of falling asleep started to present themselves? *A.* No, sir.

"*Q.* Can you tell us what effect, if any, trauma or an injury has to a reasonable medical probability upon an individual predisposed towards epilepsy? *A.* The injury usually increases the tendency for the manifestation of this epilepsy.

"*Q.* What kind of an injury is necessary, if any, to produce this? *A.* No one type of injury is necessary. Any type of injury to the head or contents of the head.

"*Q.* Based upon the history from the mother of the injuries Rebecca suffered do you know whether or not she had suffered an injury to her head? *A.* Yes, sir, she had.

"*Q.* If the testimony indicates that these symptoms of sleepiness began to be apparent within a range of seven to eight months after the accident such as she suffered, can you tell us to a reasonable medical probability as to whether or not this is consistent with a conclusion that these incidents were efficiently caused by this accident of January 31st, 1964? *A.* Yes, sir, they were.

"*Q.* What does the future hold for this young girl, doctor? What is your prognosis for her? Would you prefer to have this youngster out of the court room first? *A.* Yes, please.

"(Whereupon Rebecca Bash is taken from the courtroom)

"*A.* This form of electronic record we have manifesting epilepsy is the most vicious form to take care of because our medications do not seem to hold the patient in control for a sufficient length of time, so they will tend to break through and tend to have more problems and you have to shift the medications. The incidence of control in this particular form of epilepsy is very much less than in other forms of epilepsy."

The following excerpt from the cross-examination of Dr. Gerol is relied upon by the insurers of Ready and Szymanski for support of their contention that Rebecca's epileptic condition was not caused by the accident:

"*Q.* It was your finding, doctor, was it not, that the epileptic episodes which you found existing in this child at the time you examined her were not the result of the automobile accident? *A.* I did not think they were. The electronic emanations were not and I did not think so."

The trial court interpreted Dr. Gerol's allusion to "electronic emanations" to mean the so-called brain waves illustrated by the tracings resulting from the EEG. The court concluded that the doctor had not precisely answered the question put to him because that question asked whether the "epileptic episodes" not the "electronic emanations" were caused by the accident. Further questioning of Dr. Gerol under cross examination and after the

earlier question and answer supports the trial court's interpretation:

"*Q.* You just indicated that the tracings were not the result of the automobile accident. Can you explain that please? *A.* Yes, sir. These tracings are seen in children who have not been in automobile accidents and they are sometimes seen in children who have little overt evidence of seizures.

"*Q.* What do you mean by that? *A.* For example, the mother brings Johnnie in the office and says 'I don't know what is wrong with Johnnie,—sometimes he just stares off into space' and she is concerned about this and we run one of these records and Johnnie is producing this peculiar type of electronic emanation and Johnnie has not been involved in any automobile accident. What happens is there are some perfectly normal little children who have records like this and we pick them up sometimes from headaches or that the child is not doing well in school."

Thus the trial court correctly held that the jury had a right to believe from Dr. Gerol's direct testimony that the epileptic episodes were the sudden falling asleep of the child and that these incidents were caused by the accident.

It should be noted that none of the defendants requested an independent medical examination of Rebecca nor did they offer any medical evidence to controvert Dr. Gerol's testimony. No evidence was introduced which tended to establish that Rebecca had any "seizures" before the accident. That the seizures occurred some seven months after the accident is entirely consistent with the medical fact that the majority of patients suffering post-traumatic seizures fall into the delayed-onset group, *i.e.,*

". . . While seizures are liable to occur at any time following a head injury, there does seem to be a definite pattern, in that few develop seizures prior to two months following the injury and few develop seizures later than

five years following the injury. The largest peak on the distribution curve falls between six months and two years post-injury." [10]

We conclude that the jury included Rebecca's epilepsy, and the $35,000 for this condition and for all the other previously detailed injuries is a reasonable amount supported by credible evidence.

### Future Medical and Dental Expenses.

The jury award of $3,000 to Rebecca's mother, Mrs. Ready, is briefly attacked as being excessive. Dr. De Rose testified that Rebecca's future orthodontic care would cost up to $2,000. Although on cross-examination Dr. De Rose admitted she had stated in a report that the orthodontic work was necessary because of Mrs. Ready's negligence in not bringing Rebecca in for treatment regularly, on re-direct examination, the doctor corrected this testimony when she observed that this report assumed that no plastic surgery was performed in this period. Advised that plastic surgery had in fact been performed on Rebecca, Dr. De Rose testified that her report placing the blame on Mrs. Ready would have been changed. Thus the jury was entitled to consider that these future dental expenses would be incurred. When these future dental expenses are coupled with Dr. Gerol's testimony that Rebecca's condition would require medications and tests until she was approximately eighteen years old, the jury's award of $3,000 is entirely reasonable.

### Reduction of the Szymanski Awards.

The trial court, on motions after verdict, reduced the jury awards for Szymanski's future medical expenses

---

[10] *Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties* (Supp.) 1965, p. 516.15, sec. 32.39c (B).

and personal injuries from $1,500 and $7,000 to $650 and $3,500, respectively. Szymanski was given a *Powers* rule option to have a new trial on the issue of damages or to accept the reduced amounts.

While Szymanski elected to accept the option granted him to take judgment for the reduced amounts rather than have a new trial, he now cross-appeals from that part of the order granting such option. Under this court's decision in *Plesko v. Milwaukee*,[11] Szymanski has this right where the opposing party, as here, appeals.

Since the trial court found the jury awards as to Szymanski excessive, and gave him an option, under *Powers*, to take these reduced awards, the following rules, set forth in *Boodry v. Byrne*,[12] apply to this court's review of the trial court's action:

"Where a trial court has reviewed the evidence and has found a jury verdict awarding damages to be excessive and has fixed a reduced amount therefor, and has determined that there should be a new trial on damages unless the plaintiff exercises an option to take judgment on the reduced amount, this court will reverse only if we find an abuse of discretion on the part of the trial court. *Lucas v. State Farm Mut. Automobile Ins. Co.* (1962), 17 Wis. (2d) 568, 571, 117 N. W. (2d) 660, and cases cited therein.

"In reviewing the evidence to determine whether the damages are excessive both the trial court and this court must view the evidence in the light most favorable to plaintiff. *Kincannon v. National Indemnity Co.* (1958), 5 Wis. (2d) 231, 233, 92 N. W. (2d) 884. The trial court, however, is not required to search out one or several isolated pieces of testimony, which standing alone might sustain the damages found by the jury, but rather must review all the evidence bearing on damages and then, viewed reasonably as a whole, consider the same in the light most favorable to the plaintiff. On appeal from a determination by the trial court that the found damages were excessive, this court will not find

[11] *Supra*, footnote 2.
[12] (1964), 22 Wis. 2d 585, 588, 589, 126 N. W. 2d 503.

an abuse of discretion if there exists a reasonable basis for the trial court's determination after resolving any direct conflicts in the testimony in favor of plaintiff." [13]

We cannot improve upon the trial court's detailed analysis of the personal injuries received by Szymanski, and we quote from the trial court's opinion:

"Frank Szymanski suffered a bloody nose, sprained wrist, bruised elbow and a cut knee. He saw Dr. Kappus on February 1st at St. Catherine's Hospital. He found no fractures. The worst injury was the knee injury. The skin was cut below the right knee. The wound was sufficiently deep as to expose the ligament to the knee cap. However, the ligament was not damaged. Dr. Kappus debrided the wound and sutured it. The patient lost two weeks of work as a result of the accident. There is no question that he suffered pain during this period from all of his injuries. However, the bruised elbow and sprained wrist cleared up apparently after two weeks. The knee injury has remained a problem for Mr. Szymanski. What has happened is that a scab forms and then breaks off leaving a sore which must scab over again. This has been going on for over three years to date of trial. Dr. Kappus explained the failure to heal normally as the result of some previous knee injury which left the skin at that point as thin as 'cellophane.' Mr. Szymanski testified that the knee pained off and on right up to trial. He asserted he could not play with his children as he did before the accident; he cannot work in the garden on his knees but he has continued his regular employment without loss since two weeks after the accident. He asserted his sex life was not the same but he made no attempt to explain in detail what he meant or how the right knee played a part. Not until November 17th, 1966 (nearly three years later) did he see Dr. Burhani, a respected surgeon of this city, who advised him that the old skin could be cut away and the wound closed again. Dr. Burhani saw him again on January 30th, 1967, and on February 2nd, 1967. He told the patient that there was enough skin at the wound site to repair the wound without the need of a skin graft

[13] *Affirmed in Baumgarten v. Jones, supra,* footnote 4; and *Olson v. Siordia* (1964), 25 Wis. 2d 274, 130 N. W. 2d 827.

and that no 'flapping process' was necessary. There is no question about the existence of the wound but the record does raise the question as to the failure of Mr. Szymanski to consult a doctor for nearly three years in order to correct the trouble. The court instructed the jury on mitigation of damages in accordance with *Loser v. Libal;* 269 Wis. 418. The jury's answer indicates it disregarded the instruction. Unlike the situation in the Loser case there will be no permanent injury in this case after proper surgical treatment. Mr. Szymanski had an obligation in this case which he failed to perform. See *Casimere v. Herman,* 28 Wis. 2nd 437, 446. The damages allowed are excessive. The sum of $3500 (which is inclusive of an allowance of four weeks lost wages for the period of convalescence following surgery) is a reasonable sum (although on the high side)."

As to the award to Mr. Szymanski for future medical expenses in the sum of $1,500 which the trial court cut to $650, Dr. Burhani estimated that one week of hospitalization would be required for the operation on Szymanski's knee, which hospitalization would cost $500, and which operation would cost $150.

A review of the relevant evidence in this case compels the conclusion that the trial court did not abuse its discretion in determining that the jury awards of $1,500 and $7,000 for future medical expense and personal injuries, respectively, were excessive. Nor did the trial court abuse its discretion in reducing those awards to $650 and $3,500.

Even though the trial court's action in reducing Szymanski's awards is affirmed, Szymanski urges this court to expand the rule of *Plesko* to allow him on remand to have a new option to elect a new trial on the damage issue alone. This suggestion has been considered and we see no good reason for so altering the *Plesko* rule. The cross complainant has once elected to accept the reduced amounts and though he was able to achieve a review of the trial court's reduction decision in this appeal, under *Plesko,* that review has resulted in affirmance and the

cross complainant's first election has been made and is binding.

## Exhibit to Jury Room.

It is claimed that the trial court erred in refusing to send a certain exhibit to the jury room. The exhibit in question was a letter or report from Dr. De Rose to the attorney for Rebecca Bash. The letter stated that the "drifting" of Rebecca's teeth was due to her mother's negligence in neglecting to bring her in for treatment. The explanation of Dr. De Rose substantially qualifying the statements in the letter has been previously discussed.

A trial court is vested with broad discretion in the matter of allowing the jury to take to its room written instruments admitted into evidence.[14] Under the circumstances there was no abuse of that discretion in this case.

## Allocation of Plaintiffs' Disbursements.

The trial court divided plaintiffs' disbursements equally between the two defendant drivers. Szymanski and his insurer claim that Szymanski should pay only 25 percent of those disbursements in accordance with the jury's apportionment of negligence. They cite no authority in support of their position. We see no reason for departing from the usual rule that such disbursements shall be shared equally as between joint tortfeasors, even though they be unequal.

*By the Court.*—Judgment affirmed.

[14] *Starke v. Wolf* (1895), 90 Wis. 434, 438, 63 N. W. 755.