Jean C. JESSE, by her Guardian ad Litem, David W. Reinecke and Vern Jesse, Sr., Plaintiffs-Respondents,†

v.

R. Clarke DANFORTH, M.D., R. Clarke Danforth, M.D., S.C., Donald P. Ullrich, M.D., Neurodiagnostic Associates, a Partnership, Neurosurgical Specialists, S.C., and Neurodiagnostic Associates, a Division of Neurosurgical Specialists, S.C., Defendants-Appellants,

W. Gregory VON ROENN, M.D., W. Gregory Von Roenn, M.D., S.C., Michael V. Darnieder, M.D., Wisconsin Patients Compensation Fund, Physicians Insurance Company of Wisconsin, Inc., the Professionals Insurance Company and the Medical Protective Company, Defendants,

BLUE CROSS & BLUE SHIELD UNITED OF WISCONSIN, Milwaukee County Department of Health & Human Services, as Agent for Wisconsin Department of Health & Social Services, Division of Health, Subrogated Parties.

Court of Appeals

*No. 90–1312. Orally argued April 23, 1991.—Decided July 16, 1991.*

(Also reported in 473 N.W.2d 532.)

†Petition to review granted.

For Appellant Donald P. Ullrich, M.D., the cause was submitted on the briefs of *Michael P. Malone* and *Susan R. Tyndall* of *Kluwin, Dunphy, Hinshaw & Culbertson,* of Milwaukee.

For Appellant R. Clarke Danforth, M.D., the cause was submitted on the briefs of *Kathleen E. Bonville* and *Mark E. Larson* of *Gutglass, Erickson & Bonville, S.C.,* of Milwaukee.

For respondents the cause was submitted on the briefs of *Jack R. DeWitt, John H. Lederer* and *Eric A. Farnsworth* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.,* of Madison.

Before Moser, P.J., Sullivan and Fine, JJ.

SULLIVAN, J. Defendants-appellants (collectively, the doctors) appeal from a nonfinal order[1] which denied their motion to disqualify the firm of DeWitt, Porter, Huggett, Schumacher and Morgan, S.C.

---

[1]This court granted appellants' petition for leave to appeal on July 16, 1990.

(DeWitt), as attorneys of record for the plaintiffs (the Jesses). R. Clarke Danforth, M.D., is a neurologist, and Donald P. Ullrich, M.D., is a neurosurgeon. Both are licensed physicians under Chapter 448, Stats., and both are "health care providers" as defined in sec. 655.001(8)(a), Stats. DeWitt is a legal service corporation. Its 1986 letterhead lists thirty-one members, most of whom were partners.

The question of attorney disqualification is addressed to the broad discretion of the trial court. *Berg v. Marine Trust Co.,* 141 Wis. 2d 878, 887, 416 N.W.2d 643, 647 (Ct. App. 1987). The Wisconsin Supreme Court applied this review standard where a "serious potential" for defense counsel's conflict of interest existed. *State v. Miller,* 160 Wis. 2d 646, 654, 467 N.W.2d 118, 120 (1991) (applying *Wheat v. United States,* 486 U.S. 153, 163 (1988)). Exercise of discretion requires "a reasoned application of the appropriate legal standard to the relevant facts of the case . . .," all of which should be set forth on the record. *Id.* at 654, 467 N.W.2d at 120-21.

In 1985, a group of twenty-three doctors,[2] including Danforth and Ullrich, retained the DeWitt firm to create a legal entity for the purchase and use of a magnetic resonance imaging (MRI) scanner.[3] Attorney Douglas L. Flygt, of DeWitt, advised the doctors based on pertinent information supplied by them to Flygt. After several meetings in the office of Neurodiagnostic Associates (Neurodiagnostic), the doctors opted for a corporate structure. At oral argument, counsel stated that MRI

---

[2]The twenty-three doctors, individually, have practiced medicine under separate service corporations which DeWitt has never represented.

[3]An MRI scanner is a radiographic device technically advanced from computerized axial tomography (CAT) scanners.

Associates of Greater Milwaukee (MRIGM) was incorporated in January of 1986. MRIGM's purpose was to facilitate the purchase and marketing of an MRI. In 1987, it formed a service corporation and elected subchapter S treatment.[4] MRIGM is a partner in both Milwaukee Magnetic Resonance Consortium (MMRC) and MRI Physicians of Greater Milwaukee.[5] Danforth is a shareholder and the president of MRIGM, as well as vice-president of the MMRC board. Ullrich is also a shareholder in MRIGM.

Flygt continues to provide MRIGM with legal services to this date. He has been assisted by attorney Frederick J. Brouner of DeWitt. Peter A. Peshek, also a member of the DeWitt firm, registered as a Wisconsin state lobbyist for MRIGM, the principal. Peshek filed the 1986 "Statement of Expense by Principal" for MRIGM with the Secretary of State in January of 1986. Danforth signed the statement for the principal under his title as president.

DeWitt, through attorney Eric A. Farnsworth, has represented the Jesses since they commenced this action on October 9, 1989 for medical malpractice. The Jesses' second amended complaint alleges, *inter alia,* that Ullrich owned a CAT scanner. Ullrich leased the CAT scanner to the partnership, Neurodiagnostic, which is a division of Neurosurgical Specialists, S.C. Ullrich was the sole shareholder and managing agent of Neurosurgical Specialists. All of these parties are named defendants. Danforth, while a partner in Neurodiagnostic, allegedly

---

[4]Subchapter S is an Internal Revenue Code provision which permits a qualified small business corporation and its shareholders to elect to be taxed as a partnership while retaining the benefits of a corporation.

[5]MMRC owns and operates the free-standing MRI scanner, while MRI physicians provide the professional services.

used the CAT scanner in the diagnosis and treatment of Jean C. Jesse. At oral argument, the parties conceded that title to the CAT at the time of the alleged malpractice vested in the partnership, Neurodiagnostic. The Jesses' claimed damages are substantial. Jean Jesse allegedly has sustained severe and permanent injury, including neurological deficits.

In addition to their allegation that the defendants used Neurodiagnostic's CAT scanner in Jean Jesse's care and treatment, the Jesses further allege that they were negligent in their diagnosis and treatment of her on and about November 11, 1986, in several respects, including: (1) failing to obtain a tomography[6] of sufficient quality to accurately serve as a diagnostic tool; (2) utilizing or making available a tomography which was not of sufficient quality to serve as a diagnostic tool; and (3) failure to properly interpret the tomography. Danforth filed a motion to disqualify DeWitt on April 24, 1990. Ullrich filed his motion to disqualify on May 9, 1990.

Contemporaneous with MRIGM's incorporation, it is undisputed that: (1) the doctors, through Dr. Danforth, employed Flygt to establish a legal entity; (2) approximately twelve meetings between Dr. Danforth and Flygt occurred along with numerous telephone calls and written correspondence; (3) both doctors furnished Flygt with unspecified information concerning their medical practices and other personal information; and (4) several meetings between the doctors and Flygt concerning the pre-1986 ownership of the CAT scanner and the formation and structure of the new entity occurred.

---

[6]Tomography is "[a] method for the making of x-ray pictures which brings out details at a particular depth or plane of a tissue or organ, while blurring details at other depths or planes." 4 J.E. Schmidt, *Attorneys' Dictionary of Medicine & Word Finder* T–89 (1986).

It is also undisputed that DeWitt maintained a client list containing names of all its clients. Before accepting retainer of the new client, the Jesses, DeWitt consulted the list to ascertain the existence of any conflict. The twenty-three MRIGM doctors as individuals are not and have never been included in this list.

The doctors argue that because they are and have been existing clients of DeWitt, DeWitt violated Supreme Court Rules of professional conduct by undertaking representation of the Jesses' malpractice claim and prosecuting it against them while simultaneously acting on behalf of MRIGM.[7] The doctors emphatically assert that while DeWitt (Flygt) strives to immunize them from personal liability commercially, DeWitt (Farnsworth) simultaneously seeks to impose liability for negligence upon them. This direct adverse stance, they urge, violates SCR 20:1.7(a) and SCR 20:1.10[8]

---

[7]The doctors claim that DeWitt's simultaneous representation is a conflict of interest. **SCR 20:1.7 Conflict of Interest: General Rule,** provides:

> **(a)** A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> **(1)** the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> **(2)** each client consents in writing after consultation.
> **(b)** A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
> **(1)** the lawyer reasonably believes the representation will not be adversely affected; and
> **(2)** the client consents in writing after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

[8]**SCR 20:1.10 Imputed Disqualification: General Rule,** provides in part:

(West 1989).

The doctors' alternative argument asserts that DeWitt has violated SCR 20:1.9[9] because the individuals Danforth and Ullrich, as MRIGM pre-incorporation clients, are entitled to DeWitt's confidence. Ullrich in particular argues that he imparted information to Flygt touching on personal and tax liability relative to the structure of the entity which would own and market the use of the scanner. These communications are privileged. Disqualification in the substantially related Jesse malpractice claim is required.

Relying on the "entity rule,"[10] DeWitt denies any impropriety in their commencing a negligence claim

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

[9]**SCR 20:1.9 Conflict of Interest: Former Client,** provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

[10]**SCR 20:1.13 Organization as Client,** provides:

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

. . ..

(d) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

1051

against Danforth and Ullrich while counseling the doctors in the operational affairs of MRIGM, a corporate entity. This counseling, DeWitt insists, did not extend to the personal and individual rights and activities of the incorporators, officers, or shareholders of the corporation. In the corporate context, the entity, not its constituents, is the client. Further, DeWitt counters the doctors' "pre-incorporation client" argument with the assertion that prior representation and advice provided to incorporators Danforth and Ullrich, about the type of entity which would best meet the doctors' needs, was not representation on a substantially related matter of which the Jesses' interests are materially adverse to the doctors' interests. In short, DeWitt contends that it does not and never has represented any of the twenty-three doctors, nor have they ever been clients of DeWitt.

We conclude that DeWitt's concurrent representation of the Jesses and MRIGM, under the circumstances, is a violation of SCR 20:1.7(a) because it is directly adverse to Ullrich and Danforth, and further, is a violation of SCR 20:1.9 because of the firm's pre-incorporation representation of the doctors.[11] We further conclude that SCR 20:1.13, the entity theory, does not sanction the concurrent representation. The adverse character of the representation consists of DeWitt through Farnsworth confronting Danforth in a malprac-

(e) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

[11]The Jesses have consented in writing to the concurrent representation. The doctors and MRIGM have not consented.

tice action by a third party, after DeWitt, through Flygt, Brouner, and lobbyist-attorney Peshek, secured the twenty-three doctors' confidences in the course of advising them in the organization, incorporation, and operation of MRIGM, and continued advice thereafter. This advice extended to the matter of limiting the doctors' own tax and other personal liabilities. Most significant in this adverse confrontation is that the MRI scanner, a diagnostic tool similar to but technically advanced from the CAT scanner, is the subject of MRIGM's formation and operation. In the setting of this case, the doctors have an ongoing concern with both the MRI and the CAT scanners.

We reject DeWitt's argument that the entity theory reflected in SCR 20:1.13 insulates them from any duty of disqualification. This rule regulates the relationship between corporate counsel and the constituents of the entity, here, a service subchapter S corporation. In *Security Bank v. Klicker,* 142 Wis. 2d 289, 418 N.W.2d 27 (Ct. App. 1987), we determined that summary judgment was inappropriate because an issue of fact existed as to whether the attorney for the general partnership also represented the partners individually in the context of a legal malpractice claim for indemnity. *Id.* at 292, 418 N.W.2d at 29. The case involved an intra-partnership controversy. It did not address an attorney's representation of a stranger in a claim against the partnership and its constituents. This case before us does not concern a conflict between a doctor or the doctors' group and MRIGM.

DeWitt asserts that the exchange of personal confidences, if any, between it and the doctors occurred prior to and ended with the incorporation of MRIGM. The facts contained in the affidavits and appended docu-

ments on the disqualification motion demonstrate that this is not the case. DeWitt has continued to represent MRIGM. Confidences imparted to DeWitt are part of a continuum of representation which started in 1985, persisted through MRIGM's 1986 incorporation, through its 1987 service corporation formation and subchapter S election, survived the 1989 commencement of the Jesses' action, and remain a vibrant part of its current representation of MRIGM.

Even if the exchange of confidences ended, the rationale of *Ennis v. Ennis,* 88 Wis. 2d 82, 276 N.W.2d 341 (Ct. App. 1979), bars DeWitt's post-incorporation concurrent representation:

> Though plaintiff's present counsel may have undertaken her representation without knowledge that his former employee had represented defendant in the same action, the obvious conflict of interest would have been apparent from at least the time of the first hearing, when defendant expressed dismay that his former wife was now appearing, in essence, by his former attorney. It is wholly irrelevant whether plaintiff's counsel had any direct or indirect involvement in the original action. Defendant was a client of his firm, and was entitled to insist that any member of that firm protect his confidences and avoid any act which might adversely affect the very interests it had been engaged to protect.

*Id.* at 99–100, 276 N.W.2d at 348.

DeWitt urges that if a corporate attorney *ipso facto* becomes the personal attorney[12] for constituents, here Danforth and Ullrich, the entity approach is rendered

---

[12]*See In re Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120, 124–25 (3d Cir. 1986) (constituent's personal confidences imparted to corporate counsel before counsel's retention by the corporation remained privileged).

meaningless and the independence of corporate counsel vitiated. DeWitt relies in part upon the rationale of *Wayland v. Shore Lobster & Shrimp Corp.,* 537 F. Supp. 1220 (S.D. N.Y. 1982):

> Furthermore, Wayland's argument that the firm must be disqualified because it may have been exposed to confidential information from Wayland while he was employed at Shore is unpersuasive since, in the circumstances of Proskauer's represen- tation, it is clear that the firm was representing the corporation and thus Wayland could not have rea- sonably believed or expected that any information given to the firm would be kept confidential from the shareholders or from the corporation as an entity.

*Id.* at 1223. In that case, Wayland, as a former share- holder of Shore, sought to disqualify the Proskauer law firm from acting as counsel to Shore in Wayland's suit against Shore, concerning a severance agreement. Pros- kauer had been Shore's attorney at the time the agree- ment was entered into. The court denied disqualification of Proskauer. *Id.* at 1224. The court deemed Wayland's information not privileged because it was submitted within the ambit of the corporate embrace. *See id.* at 1223.

DeWitt's argument that the reasoning in *Wayland* applies to this case is unpersuasive. This controversy is not between MRIGM and its constituents. The Jesses have no relation to or interest in MRIGM except as litigants seeking damages. DeWitt may not enjoy the umbrage of the entity rule because it is wholly irrelevant to this situation.[13]

---

[13]Ethics Opinion E–83–9, reprinted in *Opinions of the State Bar Standing Committee on Professional Ethics,* 57 Wis. Bar Bull., June 1984, at 33, 83, adopted the views of the American Bar

Finally, the doctors argue that, apart from the existence of an attorney-client relationship between MRIGM's constituents and DeWitt, DeWitt should be prevented from representing the Jesses. They cite to former SCR 20:48 (Callaghan 1986), which urged an attorney to avoid the appearance of impropriety. While this is no longer an ethical consideration, they assert that its premise remains, and, when viewing the facts in light of it and SCR 20:1.6(a),[14] disqualification is required. We agree that even if the pre-MRIGM incorporation activity between DeWitt and Danforth/Ullrich did not directly create a lawyer-client relationship, the integrity

---

Association's Committee on Ethics and Professional Responsibility Informal Opinion 1495 (Dec. 9, 1982), which in part states:

> The committee views these provisions as clearly prohibiting a lawyer from representing one client in litigation against another client the lawyer simultaneously represents, without, at the least, the consent of both the clients after a full and frank disclosure of the possible consequences of the dual representation. The committee notes that even with the requisite client consent, it must also be "obvious" that the lawyer can adequately represent the interests of each client under the circumstances.
>
> These requirements apply even though the matters are unrelated. The duty of loyalty to the client demands that the client not be concerned about who in the business organization the lawyer may come in contact with, what the lawyer may learn or be told or, whether the lawyer may subconsciously be influenced by differing interests of another.

It is undisputed that DeWitt did not obtain the doctors' consent to the Jesses' retainer.

[14]**SCR 20:1.6 Confidentiality of Information,** provides in part:

> **(a)** A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b), (c) and (d).

of our adversarial system of justice nevertheless requires disqualification.

Recently, in the context of a felony defendant's sixth amendment constitutional right to the assistance of counsel, the Wisconsin Supreme Court determined that the trial court did not abuse its discretion to disqualify counsel who had a conflict of interest despite defendant's willingness to waive it. *Miller,* 160 Wis. 2d at 650, 467 N.W.2d at 119. Relying on *Wheat,* the court determined that the presumption supportive of an accused's right to counsel of choice is subject to countervailing institutional interests. The conflict not only "imperils the accused's right to adequate representation," but "jeopardizes the integrity of the adversarial trial process and the prospect of a fair trial with a just, reliable result." *Miller,* 160 Wis. 2d at 653, 467 N.W.2d at 120.

The trial court denied the doctors' motions for disqualification because they failed to establish that DeWitt's representation of either or both, MRIGM and its physician-constituents, related to a substantially similar subject matter of the Jesse action. The court determined that the services previously rendered to the doctors by Flygt involved only the corporation and that the Jesses' lawsuit involved the alleged malpractice of a person who also happened to be a shareholder and member of the corporation. The court concluded that disqualification was not required. We disagree and conclude, as a matter of law, that DeWitt's representation of the Jesses directly and adversely affects its representation of MRIGM and its constituents. The trial court's application of the law was erroneous, and therefore, an abuse of discretion. *See State v. Hutnik,* 39 Wis. 2d 754, 763, 159 N.W.2d 733, 737 (1968). We further conclude that even

if DeWitt's representation extended only to MRIGM and not its constituents, the integrity of our system of justice demands disqualification.

*By the Court.*—Order reversed and cause remanded.