Marshall BURKES, Plaintiff-Respondent,

v.

Edward E. HALES, Defendant-Petitioner-Appellant,†

James R. KLAUSER, Eugene C. Martin, Maureen J. Busby, Richard H. Lillie, and Nicholas Hurtgen, Defendants,

v.

M. William GERRARD, Defendant-Third Party Plaintiff,

ACCELERATION NATIONAL INSURANCE COMPANY and Rural Mutual Insurance Company, Third Party Defendants.

Court of Appeals

*No. 91–0661. Submitted on briefs October 8, 1991.—Decided November 14, 1991.*

(Also reported in 478 N.W.2d 37.)

†Petitioner to review denied.

For the defendant-petitioner-appellant the cause was submitted on the briefs of *Stephen P. Hurley* and *John D. Hyland of Hurley, Burish & Milliken, S.C.,* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Robert J. Gingras* and *Casey A. Nagy of Gingras & Schaefer, S.C.,* and *Steven J. Schooler* of *Lawton & Cates, S.C.,* of Madison.

Before Eich, C.J., Dykman and Nettesheim, JJ.

EICH, C.J. Marshall Burkes sued Edward E. Hales and other members of the Wisconsin Investment Board, claiming that he was wrongfully discharged from his position as the board's executive director. We granted Hales's petition for leave to appeal from a nonfinal order of the trial court directing that his attorney, Stephen P. Hurley, be disqualified from representing him in the case.

The disqualification stemmed from Hurley's involvement as the attorney for one set of partners in the breakup of the law firm originally representing Burkes in this case. Generally, where a lawyer finds himself or herself in the position of representing a client in a mat-

ter where a former client is on the other side, he or she will be disqualified if there is a "substantial relationship" between the two representations. *Berg v. Marine Trust Co.,* 141 Wis. 2d 878, 884–85, 416 N.W.2d 643, 646–47 (Ct. App. 1987).

Thus, the issue here is whether the trial court erred when it ruled that an attorney-client relationship between Hurley and Burkes existed by implication from Hurley's representation of the law partners and, further, that that matter and this one are "substantially related." We conclude that the trial court appropriately exercised its discretion in disqualifying Hurley and that its decision is in accord with applicable law. We therefore affirm the order.

In mid-1989, Burkes retained the Madison law firm of Fox, Fox, Schaefer & Gingras to represent him in his dispute with Hales and other members of the board, and this action was commenced shortly thereafter. Approximately one year later, Attorneys Schaefer and Gingras withdrew from the Fox law firm and departed, taking several client files—including Burkes's—with them. The remaining partners, the Foxes, retained Hurley to represent them in the intrafirm dispute, and a lawsuit was soon commenced over the firm's breakup.

In November, 1990, the parties settled most of the issues[1] in the suit. The settlement agreement gave the Foxes an ongoing financial interest in Burkes's and the other disputed client files. At about the same time, the attorney general, who had been representing Hales in Burkes's lawsuit, withdrew that representation and the governor appointed Hurley as special counsel to

---

[1]At the time the trial court heard the motion to disqualify Hurley, he was still representing the Foxes in remaining matters in the partnership lawsuit.

represent Hales. Burkes immediately moved for Hurley's disqualification and the trial court granted the motion.

Circuit courts possess "broad discretion" in determining whether an attorney should be disqualified in a given case and "the scope of [appellate] review is limited accordingly." *Berg,* 141 Wis. 2d at 887, 416 N.W.2d at 647. A court exercises discretion when it considers the facts of record and reasons its way to a rational, legally sound conclusion. *McCleary v. State,* 49 Wis. 2d 263, 277, 182 N.W.2d 512, 519 (1971). It is "a process of reasoning" in which the facts and applicable law are considered in arriving at "a conclusion based on logic and founded on proper legal standards." *Shuput v. Lauer,* 109 Wis. 2d 164, 177–78, 325 N.W.2d 321, 328 (1982). Thus, to determine whether the trial court properly exercised its discretion in a particular matter, we look first to the court's on-the-record explanation of the reasons underlying its decision. And where the record shows that the court looked to and considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law,[2] we will affirm the decision even if it is not one with which we ourselves would agree. *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20 (1981).

It need not be a lengthy process. While reasons must be stated, they need not be exhaustive. It is enough that they indicate to the reviewing court that the trial court "undert[ook] a reasonable inquiry and examination of the facts" and "the record shows that there is a reason-

---

[2]Where, of course, the court's exercise of discretion is based upon an error of law, it acts "beyond the limits of discretion" and its decision cannot stand. *State v. Hutnik,* 39 Wis. 2d 754, 763, 159 N.W.2d 733, 737 (1968).

able basis for the . . . court's determination." *Hedtcke v. Sentry Ins. Co.,* 109 Wis. 2d 461, 471, 326 N.W.2d 727, 732 (1982) (citation omitted). Indeed, "[b]ecause the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary decisions." *Schneller v. St. Mary's Hosp.,* 155 Wis. 2d 365, 374, 455 N.W.2d 250, 254 (Ct. App. 1990), *aff'd* 162 Wis. 2d 296, 470 N.W.2d 873 (1991).

There is no question here that the trial court exercised its discretion. It analyzed the facts and applicable law in a lengthy memorandum decision and arrived at its decision by "a process of logical reasoning." *Hartung,* 102 Wis. 2d at 66, 306 N.W.2d at 20. The issue is, then, whether it committed legal error along the way.[3] As indicated, we conclude that it did not.

We apply the "substantial relationship" test to determine whether an attorney should be disqualified from representing a client because of "inconsistent or adverse representations." It is a two-part test. In order to prevail on a motion to disqualify an attorney, the moving party must establish: (1) that an attorney-client relationship existed between the attorney and the former client; and (2) that there is a substantial relationship between the two representations. *Berg,* 141 Wis. 2d at 885, 416 N.W.2d at 647.[4]

---

[3]In undertaking that inquiry, we owe no special deference to the trial court's decision. Where, as here, the court has not held an evidentiary hearing on the disqualification motion, but rather has relied on affidavits, the courts "enjoy no particular advantage over appellate courts in the[ ] formulation of ethical norms." *Berg,* 141 Wis. 2d at 888, 416 N.W.2d at 648; *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (1982).

[4]*Berg* states the rule as follows:

"[W]here an attorney represents a party in a matter in which the

■

As to the first, there was, obviously, no contractual attorney-client relationship between Hurley and Burkes. Such a relationship, however, may exist either impliedly or by imputation. *See,* for example, Wisconsin's Rules of Professional Conduct, SCR 20:1.10, which impute an attorney-client relationship to all members of a law firm where only one actually represents the client.

Even more in point is *Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1319 (7th Cir. 1978), where the court of appeals recognized that situations frequently arise "where, although there is no express attorney-client relationship, there exists nevertheless a fiduciary obligation or an *implied professional relation.*" (Emphasis added.) To determine whether such a relationship may be implied in a particular case, the court looks to the nature of the work performed and the circumstances under which client confidences may have been divulged. *Id.* at 1320.[5]

---

adverse party is that attorney's former client, the attorney will be disqualified if the subject matter of the two representations are 'substantially related.' " *Id.* at 885, 416 N.W.2d at 647, quoting *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 223 (7th Cir. 1978).

The test, now employed in virtually all jurisdictions, was first announced in *T.C. Theater Corp. v. Warner Bros. Pictures,* 113 F. Supp. 265, 268 (S.D.N.Y. 1953).

[5]We acknowledge that there is no evidence that actual confidences pertaining to Burkes's case were actually "divulged" to Hurley in the context of his representation of the Fox firm. Nor is there any suggestion in the record that Burkes had any face-to-face contact with Hurley during the course of that representation, and thus "belie[ved] that he [was] consulting a lawyer in that capacity"—another aspect of the lawyer-client relationship mentioned in *Westinghouse v. Kerr-McGee,* 580 F.2d at 1319.

We do not consider the absence of such evidence to compel reversal of the trial court's decision in this case, however. First,

Among the "fairly common situations" specifically mentioned by the court in *Westinghouse v. Kerr-McGee* as creating "an implied [attorney-client] relation," despite the fact that the lawyer never "actually represent[ed] the 'client' in the sense of a formal or even express attorney-client relation," were these:

> [1.] When an insurer retains an attorney to investigate the circumstances of a claim and the insured, pursuant to a cooperation clause in the policy, cooperates with the attorney, the attorney may not thereafter represent a third party suing the insured . . ..

> [2. W]here an auditor's regional counsel was instrumental in hiring a second law firm to represent some plaintiffs suing the auditor and where the second firm through such relationship was in a position to receive privileged information, the second law firm, although having no direct attorney-client relationship with the auditor, was disqualified from representing the plaintiffs. *Id.,* 580 F.2d at 1319, citing ABA Code of Professional Responsibility, sec. EC 4-1, and *Fund of Funds, Ltd. v. Arthur Anderson & Co.,* 567 F.2d 225 (2d Cir. 1977).

We believe the Hurley/Burkes relationship is analogous to the examples just quoted. The Fox firm retained Hurley for advice and representation regarding an intrafirm dispute that involved, among other things,

where, as we conclude was the case here, there is a substantial relationship between the two representations, no showing need be made that confidences were actually shared. *See* the discussion of *Analytica Inc. v. N.D.P. Research,* 708 F.2d 1263 (7th Cir. 1983), *infra* at pages 11 and 12. Second, as we explain in more detail below, we believe that the facts of this case require us to imply or impute an attorney-client relationship between Hurley and Burkes regardless of Burkes's state of mind—or even whether he had any personal contact with Hurley at the time.

Burkes's file in this very case. Hurley was charged with representing and negotiating for the Foxes in the breakup of their law firm; and that representation included ascertaining and protecting the Foxes' interest in Burkes's and certain other client files and securing for them a continuing interest in future fees to be gleaned from those files. We have no doubt that, as Burkes's attorney, the Fox firm had a fiduciary duty to him.[6] And we agree with the trial court that Hurley, once retained by the Fox firm, undertook a similar duty and became bound by the same proscriptions as the firm itself with regard to Burkes.

Just as "[a] lawyer employed by a corporation represents the [entire corporate] entity," *Westinghouse v. Kerr-McGee,* 580 F.2d at 1318, a lawyer employed by a law firm to represent it in a dispute over its dissolution—and over certain of its individual client files—must be said to owe, at the very least, a fiduciary duty to those individual clients whose files are part and parcel of the intrafirm litigation. *See* Hazard and Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct § 1.3:108 (2d ed. 1990), where the authors state:

> *Where the lawyer's client is a fiduciary . . .,* there is a third party in the picture (namely the beneficiary) who does not stand at arm's length from the client; as a consequence, the lawyer also cannot stand at arm's

---

[6]See *Gaffney v. Harmon,* 90 N.E.2d 785, 788 (Ill. 1950) ("a fiduciary relationship exists as a matter of law between attorney and client"); *Delano v. Kitch,* 663 F.2d 990, 998 n.9 (10th Cir. 1981) ("[a]n attorney . . . has a fiduciary duty of undivided loyalty to his or her client"); *Fund of Funds,* 567 F.2d at 233 (attorney's duty to client is "tantamount to that of a fiduciary or trustee").

length from the beneficiary . . .. *Since the lawyer is hired to represent the fiduciary, and the fiduciary is legally required to serve the beneficiary, the lawyer should be deemed employed to further that service.* [Emphasis added.]

■

Doubts as to the existence of an asserted conflict of interest are to be resolved in favor of disqualification. *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 225 (7th Cir. 1978). We conclude on this record that "although there [wa]s no express attorney-client relationship, there exist[ed] nevertheless a fiduciary obligation or an implied professional relationship" between Burkes and Hurley. *Westinghouse v. Kerr-McGee,* 580 F.2d at 1319. We thus see no legal error in the trial court's conclusion to the same effect.[7]

---

[7]Hurley asserts that *T.C. Theater,* 113 F. Supp. at 265, and *P&M Electric v. Godard,* 478 S.W.2d 79 (Tex. 1972), compel a different result. He contends that in both cases an attorney hired by a disqualified attorney was held not to have an implied attorney-client relationship with the original client.

We indicated above that a fiduciary obligation or an implied professional relationship may exist where there is no explicit attorney-client relationship, depending in large part on the nature of the work performed. In *T.C. Theater,* the attorney was retained by a disqualified attorney to simply collect attorney fees that were established in amount. Our assessment of the much more involved facts of this case, their implications and the inferences to be drawn from them, satisfies us that *T.C. Theater* is of little, if any, aid in our inquiry.

As for *P&M Electric,* the court in that case, in a meagerly-explained decision, based its holding on a presumption that the principal attorney did not share confidences with the retained attorney. We believe that focusing on the nature of the services provided and the confidences divulged, as we have in this opinion, is a better approach to the problem than simply applying a pre-

We turn to the second part of the test—whether there is a substantial relationship between the two representations.

"A substantial relationship will be found to exist if the factual contexts of the two representations are similar or related." *Berg,* 141 Wis. 2d at 889, 416 N.W.2d at 648 (citations omitted). And only in situations "where we can clearly discern that the issues involved in [the] current case do not relate to matters in which the attorney formerly represented the adverse party will the attorney's present representation be treated as measuring up [to applicable standards]." *Id.* at 889-90, 416 N.W.2d at 648 (citations omitted). This is consistent with the rule that in considering such issues, "doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification." *Id.* at 890, 416 N.W.2d at 648 (citation omitted).

The only context in which Hurley may be said to have been involved with Burkes was in connection with

sumption by rote, without further explanation, as did the *P&M* court.

Finally, we again agree with the trial court that the public policy promoting freedom of choice in the selection of counsel, which we noted in *Berg,* 141 Wis. 2d at 887, 416 N.W.2d at 647, is of minimal significance here. Hales did not choose his lawyer. As a state officer, he was represented by the attorney general; and he still would be had the attorney general not withdrawn that representation because of a perceived conflict of interest between Hales and his codefendants. When the attorney general withdrew, the governor appointed Hurley to represent Hales. At the time of his disqualification, Hurley had represented Hales for only about one month. And, as the trial court noted, any voice Hales may have had in Hurley's appointment, he will also have in the governor's selection of Hurley's replacement.

this case. As we have noted at some length above, one of the aspects of Hurley's representation of the Fox firm was protecting the Foxes' interest in Burkes's client file in this litigation. In these circumstances we are unable to "clearly discern" that the two are *dis*similar or *un*related. *Berg,* 141 Wis. 2d at 889–90, 416 N.W.2d at 648. We conclude, as did the trial court, that the second part of the substantial relationship test has been satisfied.

Hurley next contends that even if the test is satisfied he may still avoid disqualification by proving that no confidences were actually shared. We disagree. The general rule is that once a substantial relationship between the two representations is shown, the inquiry ends. "If the 'substantial relationship' test applies . . ., 'it is not appropriate for the court to inquire into whether actual confidences were disclosed.' " *Analytica, Inc. v. N.D.P. Research,* 708 F.2d 1263, 1267 (7th Cir. 1983) (citation omitted.)[8] The test is whether the lawyer "could have obtained" confidential information in the first representation that would have been relevant in the second; whether such information actually was obtained and, if so, whether it actually was used against the former client is irrelevant. *Id.* at 1266 (citations omitted).[9]

---

[8]In *Berg,* we cited *Analytica* with approval, noting that its holding was "consistent with the Wisconsin rule that the client is entitled to insist that all members of a law firm, not just an individual attorney, avoid any acts adverse to the client's interest." *Berg,* 141 Wis. 2d at 892 n.5, 416 N.W.2d at 649.

[9]A majority of courts follows the rule that once the relationship has been found to exist, the attorney is irrebuttably presumed to have had access to confidential information. *See, generally,* Donald R. McMinn, Note, *ABA Formal Opinion 88-356; New Justification for Increased Use of Screening Devices to Avert Attorney Disqualification,* 65 N.Y.U. L. Rev. 1231, 1244–55 (1990). The reason for the rule is said to be this: "[R]equiring the

Hurley next contends that the ability of lawyers and their firms to obtain legal representation "will be severely and unnecessarily circumscribed" if we affirm his disqualification. We disagree. We do not create a broad rule that any lawyer who represents a law firm is thereafter unable to represent individuals whose interests are adverse to that firm's clients. We hold only that, under the particular circumstances of this case—where Burkes's client file in this lawsuit was one of the disputed items in litigation in which Hurley represented one group of attorneys in an intralaw firm dispute—the trial court did not err in disqualifying him from representing the other party to Burkes's case. Here, too, we agree with the trial court's statement that "[d]isqualification is always a fact-specific determination . . .. Remove [the unusual] fact[s] from the equation, and the outcome might be otherwise."

Finally, Hurley argues that the trial court erred as a matter of law by implicitly applying a disqualification

court to investigate whether confidences actually had passed would force the client to reveal the confidences, destroying the very protection that the . . . Model Rules have provided." *Id.* at 1247.

Some courts, including the Court of Appeals for the Seventh Circuit, have permitted rebuttal in a limited class of "imputed qualification" cases. *See,* David Ivers Note, *Prohibition Against Appearance of Impropriety Retained Under Model Rules of Professional Conduct,* 13 U. Ark. Little Rock L.J. 271, 282 (1991). These are cases where knowledge of the client's confidences was "doubly imputed"—as where one attorney, who has no actual knowledge of a case, but only "imputed knowledge" as a result of his or her membership in a law firm, moves to a different law firm and that once-imputed knowledge is then sought to be imputed a second time to the lawyer's new colleagues. This is not such a case.

standard based on the "appearance of impropriety."
Again, we disagree.

In *Berg,* we recognized that lawyers have the duty "to 'preserve the confidences and secrets of a client' and to 'avoid . . . even the appearance of professional impropriety.' " *Id.,* 141 Wis. 2d at 886, 416 N.W.2d at 647, quoting *Westinghouse Elec. v. Gulf Oil,* 588 F.2d at 224. We noted that such a rule embodies the substance of Canons 4 and 9 of the A.B.A. Code of Professional Responsibility which appeared in our own code as SCR 20.21 and 20.48 (1986). *Id.* Wisconsin adopted the A.B.A.'s Model Rules of Professional Responsibility in 1987. These rules, which replaced those in effect when *Berg* was decided, omit the "appearance of impropriety" language. According to the comments accompanying the new rules, the language was deleted for two reasons:

> First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since 'impropriety' is undefined, the term 'appearance of impropriety' is question begging.

Nevertheless, at least one other jurisdiction adopting the new rules believes it is still appropriate to consider the "appearance of impropriety" when weighing ethical matters because "its meaning pervades the Rules and embodies their spirit." *First American Carriers, Inc., v. Kroger Co.,* 787 S.W.2d 669, 672 (Ark. 1990).

We see no error in the trial court's decision. First, there is no indication that the court placed undue or even substantial reliance on appearances of impropriety in arriving at its decision. Second, while we recognize

that the mere appearance of impropriety, without more, will no longer disqualify an attorney, we agree with our colleagues on the Arkansas court that the spirit of that standard survives as a useable and useful guide for making ethical decisions. *See also Jesse v. Danforth,* 163 Wis. 2d 1044, 1056–57, 473 N.W.2d 532, 537–38 (Ct. App. 1991), *petition for review granted,* Oct. 8, 1991. Despite deletion of the "appearance" language from the code of ethical conduct, we continue to believe that considerations of "the lay sense of justice" are implicit in the new rules. *Berg,* 141 Wis. 2d at 890–91, 416 N.W.2d at 649, citing *Marketti v. Fitzsimmons,* 373 F. Supp. 637, 639 (W.D. Wis. 1974).

*By the Court.*—Order affirmed.