Mindy SOMMERS, Plaintiff-Appellant,

v.

Dr. Lisa FRIEDMAN, and Wisconsin Patients Compensation Fund, Defendants-Respondents.

Court of Appeals

*No. 92-0799. Submitted on briefs September 10, 1992.—Decided November 19, 1992.*

(Also reported in 493 N.W.2d 393.)

459

For the plaintiff-appellant the cause was submitted on the briefs of *Curtis M. Kirkhuff* of *Pellino, Rosen, Mowris & Kirkhuff, S.C.*, of Madison.

For the defendants-respondents the cause was submitted on the brief of *John W. Markson* of *Bell, Metzner, Gierhart & Moore, S.C.*, of Madison.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J.    Mindy Sommers's husband, Jay, was admitted to St. Mary's Hospital in Madison after complaining of chest pains. He died of a dissecting aortic aneurysm—a rupture of the inner layer of the aorta—a few days later, shortly after being released from the hospital by his treating physician, Dr. Lisa Friedman. Sommers sued Friedman, claiming that she was negligent in caring for and treating her husband while he was hospitalized, and she appeals from a judgment dismissing her action upon a jury verdict finding Friedman not negligent.

She raises several issues. She claims that the trial court erred in: (1) allowing other physicians who examined Jay Sommers to testify that they did not recognize or diagnose an aortic dissection; (2) refusing to allow evidence that Friedman had failed an internal medicine board certification examination at some time in the past; (3) refusing to allow the hospital and medical records to be sent to the jury room; and (4) "altering" a

461

question put forth to a witness by one of the jurors.[1] We resolve all issues in favor of the judgment and affirm.

The basic facts are not in dispute. Jay Sommers became ill while visiting in Madison on October 7, 1986. He was taken to St. Mary's Hospital, complaining of a sudden onset of chest pain. Dr. Friedman, a member of St. Mary's medical staff, became his primary treating physician. After initial testing, Friedman concluded that Jay Sommers had not suffered a heart attack, but she was unable to diagnose the cause of his pain. Other physicians and cardiologists were consulted and further tests were taken, including a treadmill/stress test and an upper gastrointestinal series, both of which gave normal results.

After these and other tests and consultations, Friedman informed Jay and Mindy Sommers that heart attack, angina and gastrointestinal problems had been ruled out as causes of his pain. On October 12, Friedman discharged Jay Sommers from the hospital, providing him with copies of all the medical and hospital records and urging him to see a physician upon return to his home in Arizona. A few hours later, he died of an aortic dissection.

Mindy Sommers sued Friedman, claiming that she was negligent in diagnosing and treating her husband's condition. After six days of testimony, the jury found Friedman not negligent and Sommers appeals from the trial court's entry of judgment on the verdict dismissing her complaint. Other facts will be discussed in the body of the opinion.

---

[1] As will be discussed in more detail below, the trial court allowed jurors to address questions to the witnesses in writing, as approved by counsel and the court.

## I. Testimony of Other Treating Physicians

There is no question that Jay Sommers was suffering from an aortic dissection when he was admitted to the hospital and that that condition caused his death several days later. Sommers's case was based in large part on the testimony of expert witnesses that Dr. Friedman violated applicable standards of medical care by failing to order a CT scan for Jay Sommers once she had ruled out a heart attack as the cause of his pain. They stated that the scan could have revealed the aortic dissection which might then have been surgically correctable. Defense experts testified that Friedman's treatment of Jay Sommers was consistent with applicable standards of medical care and practice and that, in their opinion, a CT scan was not indicated.

Three physicians—two residents and a cardiologist were allowed to testify for the defense that they, too, had examined Jay Sommers and had taken his history and reached the same conclusions as Dr. Friedman. Like Friedman, they testified that they did not diagnose an aortic dissection and had no reason to believe he was suffering from such a condition at any time during his stay at St. Mary's. The evidence was admitted over Sommers's objection and with a cautionary instruction to the jury.

The crux of Sommers's argument is that admission of the doctors' testimony was highly prejudicial and that such prejudice outweighed any probative value it may have had.[2] She maintains that the evidence did not bear

---

[2] She suggests in her brief that the evidence should have been disallowed in the first place because it had no bearing on whether Dr. Friedman exercised the required degree of care and skill in treating Mr. Sommers—the central issue in the case—but rather allowed the jury to exonerate Friedman based on the other

upon whether Dr. Friedman exercised the applicable standard of care and skill, but "merely provides [her] an escape from responsibility based upon the understandable reaction by the jury that if [other] doctors failed to diagnose the ailment, then Dr. Friedman, by default, must have met the standard of care."

Responding to Sommers's objection to the admission of the doctors' testimony, the trial court undertook to balance its probative value against the possible prejudice to Sommers's case that might flow from its admission and struck the balance in favor of allowing the evidence.

Evidence, even if relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[3] Section 904.03, Stats.; *Gonzalez v. City of Franklin*, 128 Wis. 2d 485, 498, 383 N.W.2d 907, 913 (Ct. App. 1986), *aff'd*, 137 Wis. 2d 109, 403 N.W.2d 747 (1987). The balancing, and the ultimate decision to admit or reject the evidence, remains within the trial court's discretion. *Id.* Thus, the question on appeal is not whether we agree with the trial court's ruling, but only "whether appropriate discretion was in

---

doctors' testimony, rather than on evidence relating to the applicable standard of care. Taken at face value, the argument goes to prejudice resulting from admission of the testimony, not its relevance to the issues in the case. As will be discussed below, the trial court believed the evidence was relevant, as do we.

[3] "Evidence is prejudicial if it has 'a tendency to influence the outcome [of the case] by improper means' or if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish' or otherwise causes a jury 'to base its decision on something other than the established propositions in the case.'" *Gonzalez v. City of Franklin*, 137 Wis. 2d 109, 138, 403 N.W.2d 747, 759 (1987) (citations omitted).

fact exercised" by the court. *State v. Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225, 228 (1979).

The scope of our review of discretionary rulings is well settled. Generally, "[w]e will not reverse a discretionary determination by the trial court if the record shows that discretion was in fact exercised and we can perceive a reasonable basis for the court's decision." *Prahl v. Brosamle*, 142 Wis. 2d 658, 667, 420 N.W.2d 372, 376 (Ct. App. 1987). Indeed, "[b]ecause the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary decisions." *Schneller v. St. Mary's Hosp.*, 155 Wis. 2d 365, 374, 455 N.W.2d 250, 254 (Ct. App. 1990), *aff'd*, 162 Wis. 2d 296, 470 N.W.2d 873 (1991).

To determine whether the trial court properly exercised its discretion in a particular matter, we look first to the court's explanation of the reasons underlying its decision. And if that explanation indicates that the court " 'undert[ook] a reasonable inquiry and examination of the facts' and the record shows that there is a reasonable basis for the . . . court's determination,' " we will affirm. *Burkes v. Hales*, 165 Wis. 2d 585, 590-91, 478 N.W.2d 37, 39 (Ct. App. 1991).

In this case, the trial court undertook a particularly reasoned balancing of the probative value of the challenged testimony and its possible prejudicial effect. On the latter point, the court began by stating its concern for the "potential for misuse of this evidence by the jury to conclude that [because] these other doctors did not make the appropriate diagnosis either that that [fact] might be taken as a basis to relieve Dr. Friedman of her responsibility to exercise the requisite standard of care." The court went on to discuss the relevance of the evi-

dence, concluding first that it was relevant to the degree to which Friedman considered all of the medical information available to her when she diagnosed and treated Jay Sommers. The court also believed that evidence that the other doctors did not detect an aortic dissection in their examinations of Jay Sommers was relevant to the defense's assertion that an aortic dissection is a "relatively obscure illness." We agree that the evidence was relevant.[4]

Then, balancing the relevance of the evidence against its possible prejudicial effect, the court concluded that a limiting instruction would reduce the possibility of prejudice—the potential for the jury's "misuse" of the evidence—to the point where the balance favored admission. There is no question that the trial court exercised the discretion committed to it by the cases just discussed. The question is whether there is a reasonable basis for its decision to admit the evidence. We believe there is.

Sommers renews the argument she advanced in the trial court: that admitting evidence that other treating physicians did not suspect or diagnose aortic dissection

---

[4] "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Section 904.01, Stats.

In addition to the reasons advanced by the trial court in assessing the relevance of the testimony, we note that the other doctors, one a cardiologist, took histories from Jay Sommers and examined him. Those histories coincided with the history taken by Dr. Friedman, and that fact is relevant to the care with which Dr. Friedman approached and carried out that task. In addition, the findings made by the doctors after their examinations of Jay Sommers were consistent with Dr. Friedman's postexamination findings and that, too, is relevant to the care and skill Friedman brought to her care and treatment of him.

permitted the jury to base its decision on the actions or inactions of those physicians, rather than Dr. Friedman's. In Sommers's view, the evidence would lead the jury to conclude, "by default," that Friedman must have met the standard of care because three other doctors also failed to diagnose the ailment, thus allowing her to "escape from responsibility" for her own actions. We disagree.

First, Friedman expressly acknowledged in her own testimony that she was Jay Sommers's "primary treating physician" and, as such, bore the ultimate responsibility for his course of care and treatment while hospitalized. Second, the jury was given the standard instruction on physician negligence stating, in effect, that to avoid liability, Dr. Friedman was required to exercise the degree of care, skill and judgment as is usually exercised in the same or similar circumstances. And that instruction was immediately followed by a special cautionary instruction drafted by the court to guard against any possible prejudice:

> With regard to diagnoses and opinions received from other treating physicians, you may consider that testimony as it relates to the quality of medical care actually given to Jay Sommers but you are instructed that Dr. Lisa Friedman is obligated to provide medical care consistent with the standard of care just described irrespective of the opinions of other treating doctors.

This court and the supreme court have frequently held that any "possible prejudice to a defendant is presumptively erased from the jury's collective mind when admonitory instructions have been properly given by the court." *State v. Booth*, 147 Wis. 2d 208, 216, 432 N.W.2d 681, 685 (Ct. App. 1988). *See also Roehl v. State*, 77 Wis.

2d 398, 413, 253 N.W.2d 210, 217 (1977). We assume that "a properly given admonitory instruction [will be] followed." *Booth*, 147 Wis. 2d at 216, 432 N.W.2d at 685 (quoting *State v. Leach*, 124 Wis. 2d 648, 673, 370 N.W.2d 240, 253 (1985)). Sommers has not persuaded us that the jury in this case was unable to follow the instruction and limit its consideration of the doctors' testimony to the quality of care provided by Dr. Friedman and to judge that quality under the proper standards. Given the nature of the testimony and the court's limiting instruction, we conclude that the court did not abuse its discretion in allowing the testimony.[5]

[5] Sommers also argues that admission of the evidence was improper as a matter of law. A court will, of course, be considered to have exceeded its discretion if its decision is based on an erroneous view of the law. *State v. Hutnik*, 39 Wis. 2d 754, 763, 159 N.W.2d 733, 737 (1968). Sommers points first to what she calls the "objective standard" of care in medical negligence cases: "that degree of care and skill which is exercised by the average practitioner in the class to which he [or she] belongs, acting in the same or similar circumstances." *Schuster v. Altenberg*, 144 Wis. 2d 223, 229, 424 N.W.2d 159, 162 (1988). She then states that, by admitting the other doctors' testimony, the trial court "transformed" that objective standard of care to a subjective standard because, in her words, the court's action "allowed [the jury] to determine whether Dr. Friedman's care conformed to the standard set by [the other doctors]." And she claims that this is an error of law which voids the trial court's discretionary determination. Her major premise fails, however; for, as we noted above, the trial court instructed the jury on the "average practitioner" standard and then, with specific reference to the other doctors' testimony, told the jurors that while they could consider that testimony as it might relate to the quality of care administered to Jay Sommers, Dr. Friedman remained "obligated to provide medical care consistent with the standard of care just described irrespective of the opinions of other treating doctors." The proper stan-

## II. Evidence of Past Performance on Medical Board Exams

During the trial Sommers sought to introduce evidence indicating that when Dr. Friedman took voluntary internal medicine specialty board examinations in 1982 and 1983, she failed to pass them. The trial court allowed evidence that Dr. Friedman had not attained board certification in internal medicine but refused to let Sommers explore her performance on the examinations.

The matter came up on a pretrial motion in limine, and the trial court, while acknowledging that Friedman's failure to have obtained board certification was relevant, told counsel that it wanted to hear her direct testimony—to see whether she was going to be offering expert medical testimony—before ruling.[6]

Sommers called Dr. Friedman adversely as part of her case and attempted to elicit the examination information. Sommers's attorney asked Friedman whether she was board certified, to which she responded that she was not, and he then asked whether she considered herself qualified to care for Jay Sommers and whether she believed her care and treatment of him was within the

dard of care thus remained before the jury, and the jurors were specifically charged to consider doctors' testimony in light of that standard. We see no error of law that would defeat the trial court's discretionary ruling admitting the evidence.

[6] The court stated:

I want to withhold my ruling on this until I have heard the defense direct of Dr. Friedman . . . because to the extent that the defense is offering her in the nature of an expert witness or is asking the jury to rely on her competency in evaluation, then I think the [plaintiff] is entitled to come back and say no, you shouldn't put as great a weight on her judgments and evaluations. . . .. [I]t is something that the jury may be entitled to utilize in assessing what weight . . . to give to her expert opinions because it has some tendency, albeit limited, to reflect on the weight they should give to her expert opinions.

recognized standard of care applicable to physicians, to which she responded in the affirmative. Counsel then asked the court to allow the failed-examination evidence. After hearing extensive argument on the point and reviewing the authorities, the court ruled that it would not permit Sommers to call Friedman as a witness for the purpose of impeaching her.

At the conclusion of Sommers's case, plaintiff's counsel renewed his request to put on the evidence. Again, the trial court heard lengthy argument on the question. Sommers's attorney argued that Friedman had offered expert opinions on her adverse examination and Friedman's counsel argued to the contrary. The trial court, after consulting a transcript of that examination, stated first that two questions were involved: whether the evidence was, as Sommers suggested, relevant to Friedman's overall competency; and, whether it was appropriate evidence to impeach Friedman's qualifications as an expert.

As to the first, the court stated:

> I don't think [Friedman's overall competency] is something that the jury is really called upon to analyze other than in a very general way. The [verdict] question focuses on the standard of care by the average physician. Whether [Friedman] passed her boards six years ago or whenever she took them . . . does not really go to the question of whether or not the care rendered in this case met the requisite professional standard.

The court then went through the transcript of Dr. Friedman's earlier testimony point-by-point. The court acknowledged that "to some limited extent" some of Friedman's answers involved opinions that "might be called slightly into question by the impeachment the

470

plaintiff proposes to offer" and proceeded to balance "the degree to which this evidence is relevant . . . with the danger of unfair prejudice." This time the court struck the balance against admission.

In arriving at that conclusion, the court discussed the "very limited opinion evidence" given by Friedman in her adverse testimony, and the limited relevance of her examination failures, and contrasted those factors with the danger "that the jury may make the very connection that is implicitly suggested . . . by the plaintiff, that simply by virtue of her failing to pass the boards that . . . may inevitably allow the inference that the care was substandard . . . that the jury [might] conclude simply on the basis of this evidence that the care was substandard." The court also concluded that it could not "adequately protect against that inference" by a cautionary instruction directing the jury to "limit[ ] the use of that evidence only to counteract . . . the expert opinions that this defendant has offered in the limited testimony that was put before the jury."

The court's explanation and analysis of the evidence is, again, a textbook example of the exercise of trial court discretion under the authorities we have discussed earlier in this opinion. It is brief and to the point, occupying only a few pages in the transcript. But it plainly establishes that the court "undert[ook] a reasonable inquiry and examination of the facts" of the case and arrived at its decision by "a process of logical reasoning." *Burkes*, 165 Wis. 2d at 590-91, 478 N.W.2d at 39. And, again, because the decision not to allow the evidence was one a reasonable judge could reach, we may not overturn it.[7] *See id.*

---

[7] Sommers also argues that a South Carolina medical malpractice case affirming the admission of evidence that the defen-

## III.  The Jury's Access to Exhibits

Sommers requested that the exhibits received at trial particularly the medical records be sent to the jury room during deliberations. Defense counsel objected, arguing that, given the volume and the technical nature of many of the medical record exhibits, there was a danger of confusion in that the jurors might attach undue significance to minor matters. The trial court denied the request, noting the problems surrounding the jurors' "singling out pieces of evidence," and indicated to counsel that should the jury request to see a particular exhibit or exhibits "in all likelihood I would give them that opportunity." The jury never asked to see any of the

---

dant doctor twice failed board exams in her specialty field establishes that the evidence was admissible as a matter of law and compels reversal. In the case, *Ward v. Epting*, 351 S.E.2d 867, 872 (S.C. App. 1986), the evidence came in after the doctor had testified as an expert witness—giving specific opinions on medical matters to the requisite degree of medical certainty. Here, however, the trial court concluded that the degree to which Dr. Friedman had testified as an expert (as opposed to relating the facts of her treatment of Mr. Sommers) was only very marginal; and it proceeded to balance that marginal relevance against the evidence's potential for prejudice. We consider *Ward* to be distinguishable to the point where it is of little aid to our inquiry. We also agree with the trial court that, on this record, the *relevant* fact is that Dr. Friedman was not board certified in internal medicine, and that the reasons therefor were of minimal, if any, significance. In *McCray v. Shams*, 587 N.E.2d 66, 70 (Ill. App. 1992), the Illinois appellate court upheld the trial court's rejection of evidence of a failed board exam even where the defendant doctor had testified as an expert, noting that, as in this case, the jury was aware of the lack of certification, which was the "material issue," and that "the actual reason for why he was not so certified [wa]s of limited significance."

472

exhibits and Sommers argues that the court's ruling constitutes reversible error.

A trial court "is vested with broad discretion in the matter of allowing the jury to take to its room written instruments admitted into evidence." *Bash v. Employers Mut. Liab. Ins. Co.*, 38 Wis. 2d 440, 456, 157 N.W.2d 634, 643 (1968). Sommers contends that the court exceeded its discretion by failing to adequately explain the reasons for its decision. The court's explanation is sketchy on this point; but, given the nature and volume of the exhibits and the fact that they were the subject of considerable discussion by experts testifying in the case, we believe the court did not exceed its discretion in ruling that it would await a request for the exhibits before sending them into the jury room.[8]

## IV. The Juror's Question to a Witness

The judge who presided at this trial routinely allows jurors to propose questions to witnesses, and Sommers does not question the practice.[9] Rather, she complains

---

[8] In *Hedtcke v. Sentry Ins. Co.*, 109 Wis. 2d 461, 471, 326 N.W.2d 727, 732 (1982), the supreme court stated that "[w]hen the circuit court sets forth . . . inadequate reasons for its decision, this court may engage in its own examination of the record and determine whether the . . . court exercised its discretion and whether the facts provide support for the . . . decision."

[9] Judge Frankel's practice, followed in this case, is to entertain objections from counsel to the general procedure at the outset of the case. If the procedure is approved, the jury is given a preliminary instruction on the subject and the jurors are permitted to submit questions in writing for particular witnesses. The questions are reviewed by the court and counsel outside the jury's presence and the court rules on particular objections at that time. If there are no objections, or if objections are made and overruled,

of the manner in which the court "altered" a specific question propounded by a juror.

Near the end of the trial, a juror requested that the following question be asked of one of the expert medical witnesses testifying for the defense: "When a patient comes in with potential aortic dissection, is it common to do more than one x-ray?" The trial court, believing that the juror's use of the word "potential" was vague and that the question would have "more significance or . . . greater probative value" if it spoke in terms of "suspected" aortic dissection, made the change and asked the witness: "[W]hen a patient comes in with suspected aortic dissection is it common [that] you do more than one x-ray?"

Sommers's counsel objected, arguing that the court's word change "focused on the defense contention that there was nothing in the record to lead [Dr. Friedman] to suspect [aortic dissection]" and thus created "a prejudicial atmosphere." Counsel's motion for a mistrial was denied and Sommers renews and amplifies the argument on appeal. She is not concerned with the witness's answer, only with the form of the question.

The crux of Sommers's argument is that because the question came from a juror, the jury would be aware of the word change and would consider the change to indicate that the trial court itself personally "believed that no additional x-rays were required unless [Friedman] suspected' aortic dissection." Thus, says Sommers, the test of negligence was shifted from an objective standard

Judge Frankel reads the question to the witness and counsel are given the opportunity for "follow-up" questions. *See*, Frankel, *A Trial Judge's Perspective on Providing Tools for Rational Jury Decisionmaking*, 85 Nw. U. L. REV. 221 (1990), where Judge Frankel comments on the practice and its general success over the years.

to a subjective one "if Dr. Friedman did not suspect aortic dissection, no further x-rays were necessary" and that the error is all the more serious because "the trial court itself obscured the standard."

We do not see such dire consequences flowing from the court's modification of the juror's question; nor do we agree with Sommers's assertion that the court's alteration somehow "changed the entire focus" of the case by "suggesting that the CT scan was necessary only if Dr. Friedman suspected that a dissection existed." Rather, it appears to us that, considered in the context of the testimony leading up to the question, the trial court did not err in making the alteration.

The witness, Dr. Peter Chapman, testified on direct examination that aortic dissection was a "rare" cause of the type of pain Jay Sommers was experiencing while at St. Mary's "on the order of tenths to one-hundredths of one percent rather than even one percent." He went on to discuss the type of history, symptoms and physical examination findings to be expected from a patient suffering from an aortic dissection and compared them with Jay Sommers's history, symptoms and examination results. He concluded that, based on the information available to Dr. Friedman, repeat x-rays or a CT scan were not indicated and that Friedman's care and treatment of Jay Sommers met applicable medical standards.

On cross-examination, Sommers's counsel's questions to Dr. Chapman went to the point that Jay Sommers's history, symptoms and examination results should have led a physician exercising an appropriate degree of care and skill to consider additional testing, such as more x-rays or a CT scan, that would reveal the existence of an aortic dissection. He sought to make the point that Dr. Friedman had "ruled out aortic dissec-

tion" at a point when a physician exercising due care should have gone further and tested for its presence.

After a brief redirect examination, Sommers's counsel resumed his questioning of Dr. Chapman and asked why he did not believe it would have been appropriate for Friedman, based on all the information available to her, to order "repeat chest x-rays." After an inconclusive answer, the court repeated the question and the witness responded that there were no abnormalities shown on the initial x-ray and, further, that no "new chest problems" developed during Jay Sommers's stay in the hospital, in other words, that there was no reason to believe that any problem existed that would require repeating the x-rays.

That ended the witness's testimony and the trial court immediately asked whether there were any questions from the jury. One of the jurors responded, writing down the question and submitting it to the court. It thus appears that the manner in which the court edited the juror's question comported with the testimony the jury had been hearing for a considerable period of time: Dr. Chapman's opinions as to whether Dr. Friedman, in the exercise of appropriate medical judgment, should have realized, or "suspected," that Jay Sommers might be suffering from an aortic dissection and ordered further x-rays and other tests to verify that condition or rule it out. The juror's question came on the heels of that examination and, on this record, we conclude that the trial court did not exceed its discretion in substituting "suspected" for "potential" in that question.

Finally, Sommers suggests that, by changing the wording of the juror's question, the court "crossed the line and functioned as a partisan for the defense." We reject that argument as well.

476

Sommers does not challenge the legality or propriety of the court's practice of allowing jurors to submit questions to witnesses. Indeed, it appears that most courts considering the question have generally confirmed the propriety of jury questioning. *See* Friedland, *The Competency and Responsibility of Jurors in Deciding Cases*, 85 Nw. U. L. Rev. 190, 204-05 (1990); Annotation, *Propriety of Jurors Asking Questions in Open Court During Course of Trial*, 31 A.L.R.3d 872 (1970); Annotation, *Jurors Questioning Witnesses in Federal Court*, 80 A.L.R. Fed. 892 (1986).

Here, of course, the questions were "relayed" through the trial court after giving counsel the opportunity to object. There is no question that a trial court may examine witnesses, whether called by the court itself or by a party. Section 906.14(2), Stats. "[J]udges are not referees at prize-fights but functionaries of justice [with] the power to call and examine witnesses to elicit the truth." *State v. Nutley*, 24 Wis. 2d 527, 562, 129 N.W.2d 155, 170 (1964), *cert. denied*, 380 U.S. 918 (1965), *overruled on other grounds, State v. Stevens*, 26 Wis. 2d 451, 132 N.W.2d 509 (1965) (quoting *Johnson v. United States*, 333 U.S. 46, 54 (1948) (Frankfurter, J., dissenting)). And we are "reluctant to hold that the trial court's involvement in the elicitation of testimony during a trial resulted in such prejudice as to require a new trial." *State v. Bowie*, 92 Wis. 2d 192, 208, 284 N.W.2d 613, 620 (1979). The test is whether, in its questioning, the court "overtly express[es its] view of the matters in issue"; if it does, it "function[s] as a partisan" and denies the parties a fair trial. *Id.* at 208-09, 284 N.W.2d at 620 (quoting *Nutley*, 24 Wis. 2d at 562, 129 N.W.2d at 170). In short, the court has an "obligation to see to it that justice is done but must do so carefully and in an impar-

477

tial manner." *Schultz v. State*, 82 Wis. 2d 737, 742, 264 N.W.2d 245, 248 (1978) (quoting *State v. Asfoor*, 75 Wis. 2d 411, 437, 249 N.W.2d 529, 541 (1977)).

In this case, the court's slight modification of the juror's question comported with the testimony to which it obviously related and we can neither see in, nor infer from, that modification any deviation from accepted standards of judicial fairness and impartiality.

*By the Court.*—Judgment and order affirmed.