186 Wis.2d 323 (1994)
519 N.W.2d 769
IN the MATTER OF the FINDING OF CONTEMPT IN STATE
v.
Paul KRUSE:
Roseann OLIVETO, Appellant,[]
v.
CIRCUIT COURT FOR CRAWFORD COUNTY, the Hon. George S. Curry, Presiding, Respondent.
No. 93-1074.
Court of Appeals of Wisconsin.
Submitted on briefs September 13, 1993.
Decided June 30, 1994.
*327 For the appellant the cause was submitted on the briefs of Dale T. Pasell, Kenneth P. Casey and Mark *328 Lukoff of Office of State Public Defender of Madison and Milwaukee.
For the respondent the cause was submitted on the brief of James E. Doyle, attorney general, and James H. McDermott, assistant attorney general.
Before Eich, C.J., Dykman and Sundby, JJ.
EICH, C.J.[1]
Roseann Oliveto, an assistant state public defender, was summarily found in contempt of court when, immediately following the sentencing of her client, she was heard to remark, "Ridiculous."
She argues on appeal that: (1) her remark was not a contemptuous act; (2) her statement cannot form the basis for contempt because it was a "privileged communication" to her client which was not intended to be heard by the court; and (3) she was denied her right of allocution. We resolve all questions against Oliveto and affirm the judgment.
Oliveto was representing Paul Kruse, the defendant in a bail jumping case. Kruse had been convicted and was in court for sentencing. Immediately after the trial court imposed sentence and denied Oliveto's request for a stay pending appeal, the following occurred:
MS. OLIVETO: So he is to start his sentence today?
THE COURT: That's right.

*329 (A discussion was held off the record.)
THE COURT: Did I hear you say ridiculous, Attorney Oliveto?
MS. OLIVETO: Yes, I did, Your Honor.
THE COURT: It seems to me thatmake the record reflect that the attorney for the Defendant, in open court to her client, indicated that she thought the Court's sentence was ridiculous.
MS. OLIVETO: That's not exactly what I said, Your Honor. I didn't say that entire thing.
THE COURT: Well, exactly what did you say then?
MS. OLIVETO: I just said "ridiculous." That's the only word I said, Your Honor.
THE COURT: Well, it certainly indicated to the Court contempt for the Court's sentence, and the Court will find that the defense counsel is in contempt of court and fine her $250. Pay that immediately.
MS. OLIVETO: Can I be allowed to go outside to get my
THE COURT: You can go pay it right now at the clerk of court's office.
MS. OLIVETO: My purse is in my car.
THE COURT: Go ... and bring it in and pay it. Twenty years of practicing law and being on the bench I have never heard a defense attorney sit around and call the Court's sentence ridiculous in the courtroom.
The Court thought the Court was being somewhat generous in view of the recommendations from the Probation Department. It was a three-year sentence with one year in jail, and in view of [the *330 defendant's] past behavior, irresponsible behavior and conduct and the presentence report's negative factors all taken in part, the Court felt that a compromise between what the prosecution was asking for and what the defense was asking for was a reasonable sentence, and certainly finds that that comment of the defense attorney was unreasonable, unprofessional and contemptuous of the Court and will report this to the State Bar [Board] of Professional Responsibility. Prepare a transcript and send it.
Several weeks later, the trial court entered written findings of fact including, among other things, the following:
2. Immediately at the conclusion of the sentencing process and while court was in session defendant's attorney, Rose Oliveto, turned her head to her left towards the defendant and in an aside to him angrily denounced the court's decision as ridiculous.
3. Attorney Rose Oliveto was in the actual presence of the court at all times when her visible actions and audible statement occurred inside the ... Courtroom.
4. Court was in session.
5. The officers of the court were present.
6. The court officers present were assembled and sitting in front of the rail. They were: District Attorney Timothy Baxter sitting at counsel table; Attorney Rose Oliveto ... sitting at counsel table with her client, Paul Kruse; Court Reporter, Kathleen White sitting at her reporting position; and the Clerk, Marilyn Seymour sitting at the Clerk of Court's table.

*331 7. That other attorneys, parties, criminal defendants and spectators were seated in the gallery behind the rail awaiting hearings on several other cases.
8. Attorney Oliveto's actions, demeanor and statement were visible, perceptible and audible in the courtroom.
9. Attorney Oliveto's actions, demeanor and statement were seen, perceived and heard by Judge George S. Curry.
10. Attorney Oliveto's actions, demeanor and statement were clearly and unequivocally intended to lower the defendant's respect for the court's judgment given at sentencing.
11. When [A]ttorney Oliveto looked up after making her statement to the defendant ... Judge Curry then immediately conducted a summary contempt proceeding.
12. Attorney Oliveto was afforded the opportunity to explain her actions, demeanor, statement and conduct.
13. Attorney Oliveto verified the essence of her statement but her allocution did not offer any explanation or apology to the court for her actions, demeanor, statement or conduct, nor did she attempt to mitigate them, nor did she indicate any remorse.
14. None of Attorney Oliveto's actions, statement or conduct took place in private. They were all in the actual presence of the court. They were all contemptuous of this court.
15. Attorney ... Oliveto's actions, demeanor and statement clearly indicated contempt for the court's sentencing decisions and were precisely targeted to the defendant to diminish his appreciation and *332 respect for the court's sentencing of him on the felony conviction.
16. This was defendant Paul Kruse's fourth felony conviction and therefore it was of paramount and compelling importance that respect for the court be held in high regard by him.
17. Attorney Oliveto's actions, statement and conduct interfered with the administration of justice and impaired respect due the court.
Based on those findings, the court concluded that Oliveto's actions constituted contempt of court and entered judgment ordering her to pay $250. The judgment noted that she had paid the fine on the date of the incident.

I. The Contempt
Section 785.01, STATS., defines "contempt of court" as "intentional ... [m]isconduct in the presence of the court which interferes with a court proceeding or with the administration of justice, or which impairs the respect due the court ...." The statute contemplates two types of sanctions for contempt: remedial and punitive. Section 785.01(2) and (3). There is no question that the trial court's judgment in this case was punitive"a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court." Section 785.01(2); see also Lemmons v. Racine County Circuit Court, 148 Wis. 2d 740, 746, 437 N.W.2d 224, 226-27 (Ct. App. 1989).
A punitive sanction for contempt may be imposed in either a summary proceeding under § 785.03(2), STATS., or in a nonsummary proceeding under § 785.03(1)(b). The nonsummary procedure contemplates issuance of a formal complaint by the district *333 attorney, the attorney general or a special prosecutor, and it proceeds under the normal procedural rules applicable to criminal cases. Section 785.03(2), under which Judge Curry proceeded in this case, provides as follows:
The judge presiding in an action or proceeding may impose a punitive sanction upon a person who commits a contempt of court in the actual presence of, the court. The judge shall impose the punitive sanction immediately after the contempt of court and only for the purpose of preserving order in the court and protecting the authority and dignity of the court.
[1-3]
Whether a defendant's act constitutes a contempt of court is a question committed to the discretion of the trial court. Currie v. Schwalbach, 132 Wis. 2d 29, 36, 390 N.W.2d 575, 578 (Ct. App. 1986), affd, 139 Wis. 2d 544, 407 N.W.2d 862 (1987). This is so because the question "is one which the trial court has far better opportunity to determine than a reviewing court." Id. Thus, even though the remedythe finding of contempt and the sanction imposedmay be "harsh," we will not reverse the trial court's determination "except in a plain instance of mistake or abuse of discretion." Id. And in reviewing such a determination, we defer to the trial court's findings of fact, which will not be overturned unless they are "clearly erroneous." Id.
[4,5]
With respect to the summary contempt procedure, Oliveto correctly points out that, because of the extraordinary nature of the powerit permits the "imposition of punitive sanctions without the procedural safeguards normally accorded in criminal prosecutions"it is "properly used only under a limited *334 set of circumstances." Gower v. Circuit Court, 154 Wis. 2d 1, 10, 452 N.W.2d 354, 357 (1990). Thus, under the summary-procedure provisions of § 785.03(2), STATS., the contumacious act must have been committed in the "actual presence" of the court and the sanction must be imposed for the purpose of "preserving order in the court" and "protecting the authority and dignity of the court." See also Currie v. Schwalbach, 139 Wis. 2d 544, 552, 407 N.W.2d 862, 866 (1987).[2] It is, however, "universally recognized that a court must be able to deal summarily with contempts committed in the actual presence of the court." Gower, 154 Wis. 2d at 10, 452 N.W.2d at 357 (quoting Judicial Council Committee Note, 1979, § 785.03(2), Wis. STAT. ANN.).
Oliveto argues that her act was not committed in the "actual presence of the court." She cites a footnote in the supreme court's Currie opinion indicating that the intent of the "actual presence" language in § 785.03(2), STATS., is that "the contempt need only be committed in the courtroom while court proceedings are taking place." Currie, 139 Wis. 2d at 553 n.4, 407 N.W.2d at 866 (emphasis added). And she contends that, because the transcript reveals only that Judge Curry and the court reporter were present in the courtroom, "there was no court proceeding taking place at the time of the alleged contemptuous act."
The argument is based on two premises: (1) that the proceedings ended the instant Judge Curry pronounced that the motion for bail pending appeal was denied; and (2) that Judge Curry's subsequent written findings, noting various facts surrounding the incident *335 including that others were present in the courtroom at the time,[3] must be disregarded. We reject both assumptions.
[6]
First, if anything that might occur in court in the seconds following a ruling from the bencheven acts far more egregious than those occurring heremust, as a matter of law, be deemed beyond the court's authority to sanction or correct in the exercise of its contempt powers, those powers would be hollow indeed. We decline to so diminish the contempt statutes.
Second, we are not persuaded by Oliveto's argument that we must ignore Judge Curry's written findings of fact. She cites State v. Perry, 136 Wis. 2d 92, 114, 401 N.W.2d 748, 758 (1987), for the proposition that "any conflicts between the transcript of proceedings months after an event, are decided in favor of the matters recited or not recited in the transcript."
But Perry states no such rule. Perry was a criminal case where the transcript of the trial court's sentence differed from the written judgment of conviction, and the portion of the opinion cited to us by Oliveto holds simply that "where a conflict exists between a court's oral pronouncement of sentence and a written judgment, the oral pronouncement controls." Perry, 136 Wis. 2d at 114, 401 N.W.2d at 758. There was no question in Perry concerning the efficacy of a trial court's written findings of fact made after the occurrence of an event. And we note that a trial court's findings often recite matters occurring in court that perforce would *336 not be shown in a written transcript, matters such as the demeanor of witnesses, or the reaction of jurors to a remark or event occurring in the courtroom.[4]
[7]
We noted above that summary contempt procedures are unique in that they depart from conventional constitutional protections and procedures in order to protect and preserve order and the authority and dignity of the court. See Lemmons, 148 Wis. 2d at 746-47, 437 N.W.2d at 227. And we said in Lemmons that the law tolerates such a departure "only because of its confidence in the fairness and ability of the presiding judge to accurately and fairly recount what has just occurred." Id. at 747, 437 N.W.2d at 227. Because of that confidence, the standard fact-finding procedure is abandoned and further hearings are considered unnecessary in light of the fact that "the trial court has personally observed the offense and is acting on those observations." Id. The fact that Judge Curry's findings were formally entered several weeks after the event does not undermine our confidence in his ability to fairly and accurately report it.
Oliveto also argues that the finding of contempt was improper because she had not been given notice *337 that Judge Curry was considering such a finding. She cites In re Pilsbury, 866 F.2d 22, 27 (2d Cir. 1989), as supporting her argument that "[w]here a reasonable person would not know that the court considered his [or her] conduct contemptuous, warning is required before a summary contempt conviction may be made, and some opportunity to be heard must be provided unless inconsistent with the preservation of order."
[8]
She cites no Wisconsin case on the point, and even if we were to consider Pilsbury as stating the rule to be followed in this state, we agree with the attorney general that a reasonable person in Oliveto's position would have known, given the exchange with Judge Curry following the remark, that contempt was a distinct possibility. After asking, "Did I hear you say ridiculous, Attorney Oliveto?" and she responded in the affirmative, the court stated: "[M] ake the record reflect that the attorney for the Defendant, in open court to her client, indicated that she thought the Court's sentence was ridiculous." Given that exchange and the ensuing colloquy, Oliveto has not persuaded us that she could not reasonably be expected to have anticipated the possibility that a finding of contempt was in the offing.
Finally, Oliveto suggests that a summary finding of contempt was improper because the circumstances were not such that summary action was necessary for the preservation of order or the protection of authority and dignity of the court. She offers a lengthy quotation from In re Little, 404 U.S. 553 (1972), as diapositive of the issue. Again, we disagree. Little was a case where a defendant, appearing pro se, stated in his closing argument that the court was biased and that he was a "political prisoner." Id. at 554. The court summarily *338 held him in contempt, finding that "[the defendant's] remarks were very disrespectful and tended to subvert and prevent justice." Id. The United States Supreme Court reversed, stating at one point in its per curiam opinion that the defendant's remarks did not "actually disrupt[] the court proceeding" or constitute an "imminent threat" to the administration of justice. Id. at 555. And the Court noted that, because "`[j]udges are supposed to be men [or women] of fortitude, able to thrive in a hardy climate,'" id. (quoting Craig v. Harney, 331 U.S. 367, 376 (1947)), they should be "`on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.'"Id. (quoting Brown v. United States, 356 U.S. 148, 153 (1958)). While the points made by the Court in Little are worth noting, we agree with the State that the case offers little guidance for disposition of the case before us.
We have recognized that there must be a "compelling reason" for a summary finding of contempt that is "related to `vindication of the court's dignity and authority,'" State v. Van Laarhoven, 90 Wis. 2d 67, 70-71, 279 N.W.2d 488, 489 (Ct. App. 1979) (quoting Harris v. United States, 382 U.S. 162, 164 (1965)), and we believe Judge Curry's findings state a compelling reason for his action.
The incident for which Oliveto was found in contempt occurred immediately after the court had imposed its sentence on her client and denied Oliveto's request for a stay. As Judge Curry noted in his findings of fact, Oliveto's remark was audible to several people then present in the courtroom. Most importantly, however, Judge Curry specifically found that "Attorney Oliveto's actions, demeanor and statement were clearly and unequivocally intended to lower the defendant's respect for the court's judgment given at sentencing" in *339 a proceeding in which, due to the defendant's past conduct and lengthy criminal record, the judge believed "it was of paramount and compelling importance that respect for the court be held in high regard" by the defendant.
Thus, in Judge Curry's view, the ability to instill in Oliveto's client a healthy respect for the court and its judgment was of "paramount and compelling importance" to the integrity of the proceeding itself and thus the proper administration of justice in the case. And he found that Oliveto's remark, made in open court at the time sentence was passed, was intended to dispel any such respect on the defendant's part. In Judge Curry's words, it was "precisely targeted to the defendant to diminish his appreciation and respect for the court's sentenc[e] ."
Where contempt is committed in open court, though occurring upon completion of the judicial act, and has the effect of frustrating an essential purpose of the proceeding, we believe a trial judge may properly determine that a summary finding of contempt is necessary to "protect[ ] the authority and dignity of the court" within the meaning of § 785.03(2), STATS. And where, as here, the judge has indicated that the "paramount and compelling" purpose of the proceeding was frustrated by the contemptuous act, we believe it also may be said that the outburst sufficiently impinged upon the court's ability to discharge its dutiesand thus to "preserve order" in the proceedingto warrant the use of summary contempt procedures under the statute. While not uniformly framed in the "magicword" language of the statute, Judge Curry's findings indicate that he had so determined in this case,[5] and *340 Oliveto has not satisfied us that those findings are clearly erroneous.[6]
[9,10]
We noted above that we will not reverse a trial court's determination of contempt absent "a plain ... abuse of discretion." Currie, 132 Wis. 2d at 36, 390 N.W.2d at 578. The limited scope of our review of discretionary rulings is well settled.
Generally, "[w]e will not reverse a discretionary determination by the trial court if the record shows that discretion was in fact exercised and we can perceive a reasonable basis for the court's decision." Prahl v. Brosamle, 142 Wis. 2d 658, 667, 420 N.W.2d 372, 376 (Ct. App. 1987). Indeed, " [b] ecause the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary determinations." Schneller v. St. Mary's Hosp., 155 Wis. 2d 365, 374, 455 N.W.2d *341 250, 254 (Ct. App. 1990), affd, 162 Wis. 2d 296, 470 N.W.2d 873 (1991).
To determine whether the trial court properly exercised its discretion in a particular matter, we look first to the court's on-the-record explanation of the reasons underlying its decision. And if that explanation indicates that the court looked to and "considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law, we will affirm the decision even if it is not one with which we ourselves would agree." Burkes v. Hales, 165 Wis. 2d 585, 590, 478 N.W.2d 37, 39 (Ct. App. 1991).
Steinbach v. Gustafson, 177 Wis. 2d 178, 185-86, 502 N.W.2d 156, 159 (Ct. App. 1993).
[11]
While we ourselves might not have proceeded in the same manner as Judge Curry under similar circumstances, we cannot say that he either misapplied the law or erroneously exercised his discretion under these standards when he invoked the summary-procedure provisions of § 785.03(2), STATS., to sanction Oliveto's conduct.

II. "Privileged Communication"
Oliveto argues that her remark was directed to her client and that it was thus a "privileged communication" which cannot form the basis of a contempt citation. To the extent she bases her argument on the attorney-client privilege set forth in § 905.03, STATS., it is unavailing because, under that statute, the privilege may be claimed "only on behalf of the client," and that is not the case here. And to the extent the argument is premised on general considerations of privacy in communications *342 between a lawyer and his or her client, we find it difficult to sustain such a contention in a situation where the comment was audible to other present in the courtroom.
Oliveto disagrees with this conclusion. Citing Parmelee Transp. Co. v. Keeshin, 292 F.2d 806 (7th Cir. 1961), which she asserts "is close to the facts of this case," she argues that, because her remark was not intended to be heard by the court, she cannot be held in contempt for making it. In Parmelee, a lawyer was alleged to have stated to cocounsel following an evidentiary ruling by the trial court: "That is crazy." Id. at 807. Because there was no indication in the record that the trial judge had even heard the remark, the Seventh Circuit Court of Appeals inferred that the comment was not intended to be heard by the court and ruled that the contempt had not been proved. Id. at 807, 810. There is no question in this case that Judge Curryand others present in the courtroomnot only heard Oliveto's remark but took immediate on-the-record notice of the incident, as the transcript plainly indicates.[7]
*343 [12]
Oliveto has not persuaded us that the contempt citation must fail because her remark was directed to her client or because of her assertion that it was not intended to be heard by anyone elsean assertion we note she never made in responding to the court's questions after the incident had occurred.

III. Denial of the Right to Allocution
[13]
This court held in Currie that, because of the very nature of summary contempt proceedings, the defendant should have a right of allocution: "[A] limited, but meaningful, opportunity ... to offer an explanation or justification in mitigation of the offense." Currie, 132 Wis. 2d at 49, 390 N.W.2d at 583. We said that " [i] t remains within the discretion of the trial court as to the duration and the extent of the hearing," and that "[t]his will vary from case to case depending upon the circumstances ...." Id.
Oliveto asserts that she "was allowed to say nothing in mitigation" of the matter and she characterizes the court's questions to her as asking her "to speak to guilt itself ...." She argues that, because she did not know she might be facing a contempt citation, she had no reason to "express contrition, remorse, or any other attitude ... pertinent to punishment," and she claims that she was thus effectively denied the right to allocution.
We have rejected Oliveto's earlier argument that we should reverse because she could not reasonably have known that she was facing possible contempt and was not so warned by the court beforehand. She was aware from Judge Curry's remarks that he heard the remark and considered it to be made in derogation of a *344 judicial act, yet she offered no comment other than to acknowledge that she in fact had made it.
[14]
Nor do we believe that Oliveto was otherwise denied the right to allocution. Upon hearing the remark, Judge Currie asked Oliveto whether he had heard her remark correctly, and she said he had. The judge then asked that the remark be memorialized on the record, and when Oliveto responded, correcting the judge's interpretation, he asked, "Well, exactly what did you say then?" Oliveto simply acknowledged that she had said "ridiculous," and that " [t] hat's the only word I said, Your Honor."
We believe the trial court afforded Oliveto the minimal opportunity to speak in mitigation of the contempt within the meaning of this court's Currie decision.
By the Court.Judgment affirmed.
SUNDBY, J. (dissenting.)
The contempt power "is, perhaps, nearest akin to despotic power of any power existing under our form of government." State ex rel. Attorney Gen. v. Circuit Court for Eau Claire County, 97 Wis. 1, 8, 72 N.W. 193, 194-95 (1897). The summary exercise of that power "is ancient." Dan B. Dobbs, Contempt of Court: A Survey, 56 CORNELL L. REV. 183, 187 (1971).[1]
*345 Attorney Oliveto hurled a figurative brickbat at the trial judge when, upon sentencing, she turned to her client and audibly expressed her view that the sentence just ordered was "ridiculous." The trial court fielded this verbal brickbat with more aplomb than the assizes' judge and imposed on Oliveto the modest penalty of $250.
The trial judge acted pursuant to § 785.03(2), STATS., which provides:
The judge presiding in an action or proceeding may impose a punitive sanction upon a person who commits a contempt of court in the actual presence of the court. The judge shall impose the punitive sanction immediately after the contempt of court and only for the purpose of preserving order in the court and protecting the authority and dignity of the court. [Emphasis added.]
The threshold question is whether there was a "pressing demand," United States v. Bradt, 294 F.2d 879, 885 (6th Cir. 1961), that the trial court dispose of Oliveto's alleged contempt immediately and without according her the due process protections accorded any criminal defendant. Unless that pressing demand existed, the trial court should have referred the matter to the district attorney, the attorney general or a special prosecutor appointed by the court to try Oliveto under chs. 967-73, STATS. (criminal procedure). Section 785.03(1)(b), STATS.
Section 785.03, STATS., prescribes two procedures for imposing a punitive sanction upon an alleged contemnor: *346 a nonsummary procedure subsec. (1) or a summary procedure, subsec. (2). If the alleged contempt involves disrespect to or criticism of a judge, the nonsummary procedure must be followed unless an immediate sanction is necessary to preserve order in the court and protect the authority and dignity of the court; the judge is disqualified from presiding at the trial of the contempt unless the person charged consents.
Section 785.03(1)(b) provides:
The district attorney of a county, the attorney general or a special prosecutor appointed by the court may seek the imposition of a punitive sanction by issuing a complaint charging a person with contempt of court and reciting the sanction sought to be imposed. The district attorney, attorney general or special prosecutor may issue the complaint on his or her own initiative or on the request of a party to an action or proceeding in a court or of the judge presiding in an action or proceeding. The complaint shall be processed under chs. 967 to 973. If the contempt alleged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial of the contempt unless the person charged consents to the judge presiding at the trial. [Emphasis added.]
The trial court entered findings of fact, the validity of which Oliveto challenges, and conclusions of law. I cannot say that the trial court's findings of fact are clearly erroneous. Section 805.17(2), STATS. However, the trial court did not find that Oliveto's remark disrupted the sentencing proceedings. Nor did the court find that it was necessary that it take immediate action to correct a continuing contempt. The trial court's concern was the effect of Oliveto's remark on the *347 defendant. The court found that her "actions, demeanor and statement were clearly and unequivocally intended to lower the defendant's respect for the court's judgment given at sentencing."
Clearly, the power to preserve courtroom order is essential. Dobbs, Contempt of Court, at 184. Hurling actual or verbal brickbats at the trial court judge during the course of a trial is intolerable. To maintain order in the courtroom, it is necessary for a judge to be able to find a person in contempt and impose a punitive sanction summarily. Robert J. Martineau,[2]Contempt of Court: Eliminating the Confusion Between Civil and Criminal Contempt, 50 U. CIN. L. REV. 677, 699 & n.132 (1981) (citing Bloom v. Illinois, 391 U.S. 194, 210 (1968)). "[S]ummary power is genuinely and urgently needed for cases in which the immediate judicial process is interrupted." Dobbs, Contempt of Court, at 229. The "Chicago Seven" trial showed what can happen when courtroom misconduct by some of the parties and their attorneys is not handled properly. Martineau, Contempt of Court, at 699; see In re Dellinger, 461 F.2d 389 (7th Cir. 1972), affd on reh'g, 502 F.2d 813 (7th Cir. 1974), cert. denied, 420 U.S. 990 (1975). The trial judge who was subjected to numerous and vicious verbal insults waited until the end of the trial during which such conduct occurred before proceeding with contempt citations. The government conceded that the contempt citations of all of the appellants, except the two trial counsel, had to be reversed and remanded for consideration by another trial judge. The court concluded that the trial judge was disqualified from *348 passing on the contempt specifications against trial counsel. Dellinger, 461 F.2d at 395. The court said that the insults leveled by the attorneys against the trial judge "were apt to strike `at the most vulnerable and human qualities of a judge's temperament,' thus requiring `a public trial before a judge other than the one reviled by the contemnor [s]: " Id. at 395-96 (quoting Mayberry v. Pennsylvania, 400 U.S. 455, 466 (1971)).
Contempt of court may take a number of forms: disruption in court; obstruction of the court's processes; perjury, forgery and alteration of records; symbolic acts; insult and insolence; out-of-court publications; and disobedience of court orders. Dobbs, Contempt of Court, at 186-220. Professor Dobbs suggests that a full hearing should be afforded on any disputed issue, unless for demonstrable reasons a summary hearing is urgently needed. Id. at 229. He recommended that a nonsummary hearing should carry with it the same rights as any criminal trial. Id. "Particularly, it should carry with it the disqualification of the offended or even exasperated judge." Id.
Professor Dobbs' observations and recommendations are especially important because his approach was adopted by the Wisconsin Judicial Council's Committee on Contempt (1979-80) which drafted ch. 785, STATS. Professor Martineau states that the judicial council, as a matter of policy, saw no reason to treat persons charged with contempt differently from those charged with ordinary crimes. Martineau, Contempt of Court, at 697-98. The committee adopted the "operational" approach suggested by Professor Dobbs. Id. at 687-88. This approach abandons any attempt to distinguish between or even to define civil and criminal contempt and concentrates on the procedure for imposing *349 sanctions for contempt. Id. Section 785.03, STATS., is the heart of this approach; it establishes that a decision must be made at the initiation of the proceeding on the type of sanction sought to be imposed. This decision determines not only the type of sanction to be imposed, but also the procedure to be used in the contempt proceeding. Id. at 695.
The legislature has provided that the trial judge shall impose a punitive sanction for contempt only in very limited circumstances. The judicial council's comment to the summary procedure, § 785.03(2), STATS., states in part:
It is universally recognized that a court must be able to deal summarily with contempts committed in the actual presence of the court in order to preserve order in the court and to protect its dignity and authority. This power is very limited, as is the penalty that can be imposed under s. 785.04(2)(b).

Judicial Council Committee Note, 1979, § 785.03(2), WIS. STAT. ANN.
The "operational" requirements of § 785.03(2), STATS., are that a punitive sanction thereunder must be imposed immediately and that its sole purpose is to preserve order in the court and protect the authority and dignity of the court. Martineau, Contempt of Court, at 700. If these conditions are not present at the time of the alleged contempt, the trial court must refer the alleged contempt to the district attorney, the attorney general or a special prosecutor for nonsummary prosecution under § 785.03(1)(b).
Our pre-revision decision, State v.Van Laarhoven, 90 Wis. 2d 67, 279 N.W.2d 488 (Ct. App. 1979), continues to be precedential on the question of when the trial judge may summarily impose a punitive sanction for contempt of court. The prior contempt of court statute *350 provided that the trial judge could act summarily "only immediately after the allegedly contemptuous behavior has taken place, if necessary to preserve the order of the court and protect the authority of the court." Section 757.04(1)(b), STATS., 1977. The judicial council's comment to § 785.03(2), STATS., does not show that the committee considered that the language of § 785.03(2) changed the law in this respect.
In Van Laarhoven, the defendant, upon hearing the jury's guilty verdict in his brother's trial, called the members of the jury "stupid" and stated that he did not know how they could live with themselves. The trial judge immediately excused the jury and summarily held Van Laarhoven in contempt and sentenced him to ten days in jail. When Van Laarhoven made disrespectful remarks directed at the judge, the judge extended his jail sentence to thirty days. We affirmed the sentence of ten days, but vacated the extended sentence. We recognized that to justify summary contempt, due process required that there be a compelling reason for immediate punishment related to "`vindication of the court's dignity and authority.'" Van Laarhoven, 90 Wis. 2d at 70-71, 279 N.W.2d at 489 (quoting Harris v. United States, 382 U.S. 162, 164 (1965)). We held that a compelling reason existed for the initial ten-day sentence because the jury had been exposed to insulting remarks and actions within the courtroom. Id. at 71, 279 N.W.2d at 489-90. However, as to the twenty-day sentence, we concluded that summary contempt was not appropriate for two reasons. First, at the time, the trial judge had become "embroiled with" Van Laarhoven. Second, summary contempt was not necessary to preserve order because Van Laarhoven had been arrested and was being removed from the courtroom by *351 a bailiff.[3] We concluded that the contempt should have been handled under the nonsummary contempt procedures.[4]Id. at 73, 279 N.W.2d at 491.
The facts in Van Laarhoven are not greatly dissimilar from the facts in this case. In each case, the court proceeding was over. In each case, the contemptuous conduct involved disrespect to or criticism of the judge. Of course, Oliveto's conduct did not approach that of Van Laarhoven's. The extent to which the trial judge became "personally embroiled" with Oliveto was far less than the embroilment of the judge in Van Laarhoven with the alleged contemnor. However, the degree to which the trial judge has become "personally *352 embroiled" with the alleged contemnor does not determine which procedure should be followed. If it did, the contemnor whose conduct was egregious would receive more procedural safeguards than the alleged contemnor whose disrespect of the judge was relatively mild. This paradox was discussed in a note considering the decision of the United States Supreme Court in Offutt v. United States, 348 U.S. 11 (1954). Note, Criminal LawContemptConduct of Attorney During Course of Trial, 1971 Wis. L. REV. 329, 339-41 (hereafter Note, Contempt During Course of Trial).
In Offutt, the trial judge gave the contemnor as good as he got. The Supreme Court concluded that the trial judge's behavior "precluded that atmosphere of austerity which should especially dominate a criminal trial and which is indispensable for an appropriate sense of responsibility on the part of court, counsel and jury." Offutt, 348 U.S. at 17. The Court concluded that the trial judge should not have determined the contempt summarily because his embroilment with the alleged contemnor raised a question as to the judge's ability to impartially determine the contempt.
The author of Contempt During Course of Trial observes that the Sixth Circuit Court of Appeals resolved the paradox by substantively extending Offutt to a case in which the trial judge was, at best, only arguably personally embroiled.[5] Note, Contempt During Course of Trial, at 341. The court said: "In the present case, we find no pressing demand that contempt *353 proceedings be heard and disposed of immediately." Bradt, 294 F.2d at 885.
The legislature has resolved the paradox by requiring that the trial judge who has been shown disrespect or been criticized refer the matter for prosecution, unless it is necessary for the trial judge to act immediately to preserve the order of the court. Section 785.03(1)(b), (2), STATS. The degree to which the trial judge has become "embroiled" with the alleged contemnor is irrelevant under this statute; if the alleged contempt involves disrespect to or criticism of the judge, that judge may not decide the contempt, unless immediate action is necessary.
The approach which the legislature adopted in ch. 785, STATS., reflects a balancing of the needs of the court as a judicial institution and the rights of the individual. This balancing of the public and private interests is required whenever the question is the process due the individual. The factors involved in that balancing are set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976):
[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
These factors militate in favor of providing an alleged contemnor with most of the safeguards of procedural due process, where the government's interest does not require immediate action.
*354 Weighing heavily in favor of the individual is the nature of the contempt power. "Criminal contempt is a crime in the ordinary sense ...." Bloom, 391 U.S. at 201; see also Vilter Mfg. Co. v. Humphrey, 132 Wis. 587, 590, 112 N.W. 1095, 1096 (1907). While the legislature has abolished the distinction between civil and criminal contempt, it has made the procedures which govern ordinary criminal matters applicable to contempt complaints seeking punitive sanctions. Martineau, Contempt of Court, at 697.
Professor Martineau states that the judicial council thought it particularly important that the judge not file the charges against the alleged contemnor because of the adverse affect on the appearance of justice. Id. Professor Martineau comments that: "The prohibition protects the appearance of justice and limits the potential for abuse of the contempt power." Id. at 698-99.
The legislature has determined that unless it is imperative that the trial judge act immediately to quell a disruption of proceedings, the interests of the individual require that his or her guilt be determined in a proceeding which provides the process afforded a person charged with a crime. Under § 785.03(1)(b), STATS., the alleged contemnor has all of the rights and privileges of a defendant in a criminal proceeding, including (1) a hearing before an unbiased judge, Mayberry, 400 U.S. 455; (2) a presumption of innocence until proven guilty beyond a reasonable doubt, Gompers v. Buck's Stove & Range Co., 221 U.S. 418 (1911); (3) notice of the charges, and a right to prepare and present a defense, Cooke v. United States, 267 U.S. 517 (1925); and (4) a right to a jury trial if the sentence imposed is imprisonment for more than six months, Bloom, 391 U.S. 194. Martineau, Contempt of Court, at 697 n.126.
*355 Professor Martineau notes that the safeguards afforded the contemnor under ch. 785, STATS., exceed those mandated by the United States Supreme Court. Id. at 697. He states that the Wisconsin Judicial Council, as a matter of policy, saw no reason to treat persons charged with contempt differently from those charged with ordinary crimes. Id. at 697-98. See also Judicial Council Committee Note, 1979, § 785.03(1)(b), Wis. STAT. ANN. The judicial council concluded that application of the criminal procedure to punitive sanction contempt proceedings eliminates confusion as to the procedures to be followed. Martineau, Contempt of Court, at 698.
The judicial council intended that § 785.03(2), STATS., be in accord with its federal counterpart, Federal Rule of Criminal Procedure 42. Judicial Council Committee Note, 1979, § 785.03(2), Wis. STAT. ANN. Decisions construing Rule 42 are therefore persuasive in interpreting and applying § 785.03(2). Congress intended to limit "`the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice.'" United States ex rel. Robson v. Oliver, 470 F.2d 10, 13 (7th Cir. 1972) (quoting In re McConnell, 370 U.S. 230, 236 (1962)). In United States v. Wilson, 421 U.S. 309, 319 (1975), the Court said:
Where time is not of the essence ... the provisions of Rule 42(b) [785.03(1)(b), STATS.] may be more appropriate to deal with contemptuous conduct. We adhere to the principle that only "[t]he, least possible power adequate to the end proposed" should be used in contempt cases. Anderson v. Dunn, 6 Wheat. 204, 231 (1821). See Taylor v. Hayes, 418 U.S. 488, 498 (1974).
*356 See also Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 230-31 (1821) (remedy for contempt of House of Representatives is "the least possible power adequate to the end proposed"); In re Gustafson, 619 F.2d 1354, 1356-57 (9th Cir. 1980) (Rule 42(a), summary disposition, is confined to unusual situations where instant action is necessary to protect the judicial institution itself); William E. Aiken, Jr., Annotation, Attorney's Conduct as Justifying Summary Contempt Order Under Rule 42(a) of the Federal Rules of Criminal Procedure, 58 A.L.R. FED. 22 (1982).
Oliveto's right to due process will be adequately safeguarded in a nonsummary procedure. It is important that she be provided with the safeguards contained in the Criminal Code, not only because contempt is in the nature of a criminal act but because a contempt finding against an attorney may have occupation-threatening consequences. Oliveto remains subject to intra-professional discipline, the ramifications of which may far exceed those of the legal sanction imposed by the trial judge. See Note, Contempt During Course of Trial, at 352. In fact, in this case, the judge ordered the court reporter to prepare a transcript of the proceedings involving the alleged contempt and to send the transcript to the Board of Attorneys Professional Responsibility. Thus, Oliveto faces a real threat of disciplinary action.
The majority does not give sufficient weight to the fact that the Wisconsin legislature has chosen to treat a person charged with contempt as it treats a person charged with a crime. The Judicial Council Committee believed it particularly important that the summary contempt authority be used very sparingly and only when immediate action was necessary. Here, the trial judge did not find a "pressing demand that the contempt *357 proceeding be heard and disposed of immediately" as in Bradt, 294 F.2d at 885.
As I have pointed out, the process due an individual whenever the government adversely affects a person's property or liberty interest requires a balancing of the government's interest and the private interest that will be affected by the official action. Because contempt is a "despotic" power, which, if exercised summarily, deprives the defendant of most of the protections of procedural due process, that power should be exercised summarily by trial judges only in very limited circumstances, which I do not find present in this case. I see no reason why Oliveto should not be provided the same due process safeguards which protect the criminal defendant. I dissent.
NOTES
[] Petition to review granted.
[1] The case was assigned to the writer on May 12, 1994, pursuant to the court's internal operating procedure, which provides in part: "In the event the opinion is assigned to a judge representing the minority view, the opinion will be reassigned by lot to a member of the majority." WIS. CT. APP. IOP VI(4)(i) (July 15, 1991).
[2] In addition, the sanction must be imposed immediately after the contempt. Section 785.03(2), STATS. There is no question that Judge Curry imposed the sanction on Oliveto immediately after the occurrence.
[3] We note in this regard that the transcript itself shows that, at the very least, the judge, the reporter, the district attorney, Oliveto and her client were present.
[4] Indeed, in an earlier, unrelated section of the Perry opinion, the supreme court discussed at length the procedures to be followed where portions of a trial transcript are missing and the question arises whether there is a sufficient record for appeal. If, in such a situation, reconstruction of the record from reporters' notes or other sources is impossible and the parties cannot agree on a statement of facts, the trial court may, "based on its own recollection [and] trial notes," or on consultation with counsel, affidavits, or recall of witnesses, "`settle and approve' the state of the record" for the appeal. State v. Perry, 136 Wis. 2d 92, 102, 401 N.W.2d 748, 752 (1987) (emphasis added).
[5] In this court's opinion in Currie v. Schwalbach, 132 Wis. 2d 29, 38, 390 N.W.2d 575, 578-79 (Ct. App. 1986), we noted that, even where the trial judge "did [not] expressly find that [the contemnor's] conduct interfered with a court proceeding or with the administration of justice," it was "readily apparent from the record of the proceedings and from the findings and conclusion that the trial court did make," that that was the result of the conduct. "The trial court's description of the conduct and its effect upon the proceedings, coupled with the conclusion that the conduct constituted a contempt of court, satisfies all the elements of a contempt ...." Id.
[6] In Kaminsky v. Milwaukee Acceptance Corp., 39 Wis. 2d 741, 746-47, 159 N.W.2d 643, 646-47 (1968), the supreme court held that the standard of review of a trial court's findings in a contempt proceeding is whether the findings are contrary to the great weight and clear preponderance of the evidence; that is, whether they are clearly erroneous. See Noll v. Dimiceli's, Inc., 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct. App. 1983) ("clearly erroneous" test and "great weight" test are "essentially the same").
[7] The suggestion in Oliveto's brief that the only way Judge Curry could have heard her remark was either through inadvertence or "eavesdropping on protected attorney-client communications" (emphasis added) adds nothing to her argument. The same may be said, we think, for her characterization of Judge Curry's action as "Kafka[esque]," her assertion that the judge was simply using the contempt proceedings as "a club ... on [her] client," her admonition that we "should swiftly put an end to [Judge Curry's] invitation to join in a trip to Wonderland," on her statement that the court's instruction to consider her act as contempt was "the Judge [s] ... little secret."
[1] In 1631 at the Salisbury assizes, a prisoner aggravated at his sentence "ject un Brickbat a le dit Justice que narrowly mist ..." Dan B. Dobbs, Contempt of Court: A Survey, 56 CORNELL L. REV. 183, 187 (1971). An indictment was immediately drawn and "son dexter manus ampute & fix al Gibbet sur que luy mesme immediatement hange in presence de Court." Id. (quoting Anonymous, Dyer 188b (note) (1688 reprint)). The translation from law French is: "[The prisoner] threw a brickbat at the said Judge, which narrowly missed; and for this and indictment was immediately drawn ... against the prisoner, and his right hand cut off and fixed to the gibbet, upon which he was himself immediately hanged in the presence of the Court." Id. at n.9 (quoting 73 Eng. Rep. 416 n. (1631)).
[2] Professor Martineau was the reporter for Wisconsin's Judicial Council Committee on Contempt (1979-80) which drafted ch. 785, STATS., enacted by Laws of 1979, ch. 257, § 11. His article describes the deliberations of the committee.
[3] The Judicial Council Committee Note to § 785.03(2), STATS., stated that the exercise of summary contempt authority "does not depend upon whether the person committing the contempt is in custody, contrary to State v. Van Laarhoven ...." Judicial Council Committee Note, 1979, § 785.03(2), Wis. STAT.
[4] With respect to the "embroilment" issue, we quoted at length from United States v. Meyer, 462 F.2d 827, 839 (D.C. Cir. 1972), as follows:

In other words, once a judge has been personally attacked in such a manner that a judge of ordinary sensibilities might naturally be expected to harbor "marked personal feelings" against the attacker, the law must assume that such feelings exist, even though the judge, through admirable forbearance, gives no outward indication that he has been personally affected. This assumption is necessary, presumably, for two reasons. First, personal animosity may in fact exist in a judge who is outwardly unperturbed; and, second, even if the judge possesses singularly charitable instincts and in fact entertains no personal feelings, the public might reasonably suspect that such was not the case. In this latter situation, disqualification would be necessary in order to protect the integrity of the judiciaryso that "justice ... [can] satisfy the appearance of justice."
[5] The Supreme Court has held it to be a violation of due process for a judge who acted as a "one-man grand jury" and before whom the alleged contempt had been committed to judge the contempt even though there was no personal involvement. In re Murchison, 349 U.S. 133, 137 (1955).